## BOARD OF EDUCATION OF FREDERICK COUNTY

### v.

**I.S., a minor, by her parents and next friends, Steven and Kelli SUMMERS, et al.**

#### No. CIV.A.RDB 02–3759.

United States District Court, D. Maryland, Northern Division.

May 7, 2004.

Leslie R. Stellman, Hodes Ulman Pessin and Katz PA, Towson, MD, for Plaintiff.

Harold L. Segall, Pamela D. Marks, Beveridge and Diamond PC, Baltimore, MD, Anna Jenefsky, Law Office of Anna Jenefsky, Bethesda, MD, for Defendants/Counter Claimants.

Jeffrey A. Krew, Jeffrey A Krew Attorney at Law, Ellicott City, MD, Counter Defendant.

## MEMORANDUM OPINION

BENNETT, District Judge.

The Board of Education of Frederick County ("FCPS") has brought this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400—1487, against IS, a minor, and her parents, Steven and Kelli Summers (the "Parents"). FCPS challenges the October 17, 2002 decision of Administrative Law Judge Alan B. Jacobson of the Maryland State Office of Administrative Hearings ordering FCPS to fund IS' placement in a private school for the remainder of the 2002–2003 school year. Currently pending before the Court are (1) the Motion of Plaintiff FCPS for Summary Judgment, and (2) the Amended Cross–Motion for Summary Judgment of Defendants, IS and her parents. The Court has reviewed the entire administrative record and has carefully examined the parties' submissions. No hearing is necessary. Local Rule 105.6 (D.Md. 2003). For the reasons that follow, the Court will deny Plaintiff's Motion and grant Defendants' Motion, in upholding the decision of the Administrative Law Judge.

### Background [1]

IS is a multiply-disabled child born on September 17, 1993. She suffers from low

---

1. The facts set forth in this section are derived from the administrative record of the due

muscle tone, motor planning difficulties, and a severe language/articulation disorder. These conditions have not been linked to a specific medical diagnosis, although the Parents believe, based on their discussions with medical experts, that IS has a central nervous system disorder.

This case has an extensive chronology. During the 1999–2000 school year, at age six, IS attended kindergarten at Taylor Elementary School in Arlington, Virginia. She received special education services in a countywide augmentative education program, pursuant to an Individualized Education Program ("IEP"), which classified her as having developmental disabilities. She spent most of her school day in a regular education classroom with twenty-five students and received occupational therapy weekly in her regular classroom and in a therapy room.

In December 1999, IS' auditory comprehension was at the level of a four-year, three-month old. Her expressive communication was at the level of a two-year, nine-month old. She predominantly communicated in two-word expressions augmented by signs, gestures and body movements. By the end of the 1999–2000 school year, IS could identify all letters of the alphabet. She could read many important one-syllable words with and without picture symbols to cue her. Due to significant motor planning problems, she could not independently form the letters of the alphabet with a pencil. However, during the summer of 2000, when IS participated in extended school year ("ESY") services at Taylor Elementary, her writing improved, and she learned to write her first and last name using a mix of upper and lower case letters. With respect to mathematics, IS could count by rote up to twenty and add groups of manipulatives (tangible items) with a sum of ten. She recognized the numbers one through twenty and the penny, nickel, and dime. However, the more she worked with these concepts, the less consistent she became.

In the general education classroom, IS had significant difficulties focusing on activities due to visual and auditory distractibility. Moving her to a table separate from her classmates was only moderately successful. In the therapy room, IS required prompting to stay on task. IS' difficulty in focusing on her instructor's mouth interfered with her improvement in speech sound production. She was given a voice output device to reproduce word sounds and to help her to communicate. When she was given a larger array of word symbols to use with the device, "she was unable to use the device efficiently, since, rather than look at the symbols carefully, she tended to push them randomly." App. Ex. 23. Her attention difficulties interfered with her learning, performing class routines, and exhibiting appropriate behavior. In physical education ("P.E.") class, IS' distractibility caused her to interrupt her own movements, placing her own safety and the safety of her classmates at risk. Over the course of the school year, IS' mother reported that her behavior became disruptive and aggressive towards other students.

In the summer of 2000, IS moved with her family to Frederick, Maryland. The Parents requested FCPS to provide an educational environment for IS that was more intensive than her kindergarten placement at Taylor Elementary in light of her distractibility and problem behaviors there. Specifically, they asked FCPS to provide IS with P.E., art, music instruc-

process hearing, including the hearing transcript and admitted exhibits. In addition, the Court has considered certain additional evidence not available at the time of the due process hearing. *See* Order dated December 23, 2003.

tion, and speech, occupational, and physical therapies at North Frederick Elementary School ("NFES") for half of the school day. The Parents also asked FCPS to help them develop a course of home-based one-on-one academic instruction. FCPS rejected the Parents' proposal as contrary to local and state law and offered to place IS in a regular education classroom at NFES.

During the 2000–01 school year, IS was home schooled, principally by her mother. FCPS, however, implemented services recommended on IS' IEP prepared by Arlington County Public Schools in the manner permitted by its own regulations. Following an initial IEP Team meeting in August 2000, FCPS provided IS weekly with one hour of occupational therapy; one hour of physical therapy; one and one-half hours of speech-language therapy (in a therapy room at NFES); and consultative special education and Augmentative Communication Technology ("ACT") services.

Beginning in September 2000, FCPS administered a battery of tests to IS to determine her abilities and functional limitations. At a psychological assessment administered on September 12, 2000, IS was unable to perform verbal intelligence testing due to her inability to translate pictures into expressive vocabulary that could be understood by the tester. On the Leiter–R nonverbal intelligence test, IS' full-scale IQ score was eighty-four, in the low-average range. Her subtest scores were scattered, however, and she scored average to above average on two of the more difficult subtests and less well on some of the simpler tests. Her adaptive behavior assessments were scattered, although generally below her chronological age. Her functional independence as of September 2000 (when she was seven years old) was comparable to that of a child aged three years, nine months. She continued to have issues with eating and

meal preparation, as well as toileting and dressing skills. She struggled with time and punctuality, money and value skills, work skills, and home and community orientation skills. Her social interaction skills were age appropriate and manageable for her, while her language comprehension skills were assessed as between the ranges of limited to age appropriate.

On September 18, 2000, FCPS prepared an ACT Team intake form, which found that IS' oral-motor difficulties rendered her speech only fairly intelligible at times. IS communicated through gestures, sign language, word/picture boards, and speech. On November 3, 2000, FCPS administered an educational assessment to IS. Again, much of her speech, which consisted on one-word utterances and short phrases, was unintelligible to the examiner. IS supplemented her speech with gestures and by pointing to picture symbols in her communication book. Based on the results of the Brigance Diagnostic Inventory of Early Development, it was determined that IS' fine motor skills ranged from 3.5 to 5.0 years, self-help skills ranged from 2.0 to 4.0 years, general knowledge and comprehension skills ranged from 3.0 to 6.0 years, social-emotional skills and behaviors ranged from 4.0 to 6.0 years, readiness skills ranged from 5.3 to 6.3 years, and basic math skills ranged from 4.0 to 6.3 years. IS was 7.2 years old and had never attended an FCPS school at the time of the testing.

A functional gross motor skills physical therapy assessment administered on October 23 and 30, and November 13, 2000 determined IS to be independent in accessing the school environment without assistance. However, IS demonstrated delays in her advanced gross motor skills that would have impacted her participation in a regular physical education class. The examiner recommended gross motor exer-

cises to develop stability and mobility and a consult with adapted physical education. IS was distracted by activity nearby.

An occupational therapy assessment administered on November 6 and 14, 2000 found that IS suffered from low muscle tone, most predominantly in her hands, which "greatly impact[ed] the development of mature hand skills and motor patterns in her hands . . . ." Bd. Ex. 15 at 3–4. She had difficulty forming accurate signs, but was able to develop emerging skills in letter formation, particularly when printing upper case letters. IS was independent in eating, clothing, using fasteners, and managing supplies, although she required occasional verbal cues to direct her attention to the pending task.

A November 29, 2000 ACT Team evaluation reported its observations of IS in the speech therapy room: IS had an elaborate communication book that implemented a picture communication system ("PCS"). She articulated sounds in isolation, but her articulation errors increased and her intelligibility decreased in multi-syllabic words and with an increase in sentence length in connected speech. The ACT Team recommended that IS receive experiences with typical peers as much as possible to provide speech and social interaction models. The Team recommended that IS continue using sign language and PCS to enhance her intelligibility. The Team also recommended the use of communication boards and a Step–by–Step device at school and home, and use of the Voice–in–the–Box device and computer software to emphasize phonological sequencing in the therapy room.

The IEP Team met on January 16, 2001 to review the assessments and the ACT Team observation and recommendations. The IEP Team recommended reducing IS' occupational therapy from one hour to one-half hour per week and discontinuing IS' physical therapy services altogether. IS'

physical therapist did not attend the meeting.

On January 17 and 24, 2001, FCPS administered a speech, language, and auditory assessment to IS. On the Expressive and Receptive One–Word Picture Vocabulary Tests, which measure a child's ability to verbally identify a picture and to identify a picture from among a group of pictures, respectively, IS scored in the first percentile. On the Test of Language Development, which tests the areas of oral vocabulary, grammatic understanding, sentence imitation, and grammatic completion, IS scored no higher than the second percentile. On the Test of Auditory–Perceptual Skills, which tests a child's ability to process information orally and to respond to tasks, with one exception, IS' scores ranged from below the first percentile to the fifth percentile. She scored in the twenty-fifth percentile in auditory interpretation of directions. On the Goldman–Friscoe Test of Articulation, IS "was difficult to understand due to significant misarticulations in all positions of words." App. Ex. 27. She was found to "suffer from some degree of apraxia, i.e., the inability to do voluntary [verbal and oral nonverbal] movements, and trouble sequencing multi-syllables together . . . ." Id. She performed below her cognitive ability in vocabulary, auditory processing, speech articulation skills, and general language performance. She was identified as having a moderate language disorder and a severe articulation disorder, which significantly affected her social, emotional, and academic functioning.

On February 8, 2001, FCPS issued a Quarterly IEP Goals Report, which stated that IS was "making nice progress toward achieving [her speech-language goals] by the annual review date." Bd. Ex. 22.

On February 20, 2001, the IEP Team met to review IS' speech, language, and

auditory assessment and to develop a new IEP to cover the period from February 2001 to February 2002. At that time, FCPS and the Parents anticipated that IS would attend NFES full-time during the 2001–02 school year. The new IEP identified IS as multidisabled and provided her with special education consultative services for the remainder of the 2000–01 school year (during which she was home-schooled), and five hours per week of special education services for the period September 5, 2001 through February 20, 2002. The IEP called for one and one-half hours per week of speech-language therapy, one-half hour per week of occupational therapy, and consultative services by the ACT Team. Physical therapy was not included.

During the summer of 2001, IS received extended school year services consisting of one hour per week of speech-language therapy. At an IEP Team meeting on June 5, 2001, IS' speech-language therapist, Beverly Ford, reported that IS had made progress with her IEP goals. IS' special education facilitator, Joy Campbell, who observed IS during a service session at NFES, reported that IS had difficulty walking outside and nearly fell off of her chair. She also needed frequent redirection and visual cues. FCPS referred the case to the County IEP Team to discuss the possibility of assigning a full-time transitional assistant to IS. The County IEP Team convened on July 19, 2001 and found that IS required assistance with toileting and eating and posed a safety risk. She had an unusual gait, was unsteady on her feet, and had difficulty walking down the hall to the speech therapy room. She frequently drooled and required reminders to swallow. Her speech was often unintelligible. The County IEP Team recommended use of a full-day transition assistant.

For the 2001–02 school year, IS was placed in Erin Clagett's first grade class-room with sixteen students at NFES. She received five hours of special education services per week from Judith Kearney, who both "plugged in" to Ms. Clagett's class and pulled her out of the classroom for small group support. Beverly Ford continued to provide IS with speech-language therapy. On September 15, 2001, FCPS issued a Quarterly IEP Goals Report stating that IS was making sufficient progress toward achieving the goals by the annual review date.

On September 20, 2001, IS was observed by the ACT Team in the classroom and during an individual speech therapy session. The Team recommended that IS continue using voice output devices, which enhanced her speech when she composed sentences. FCPS, however, discontinued use of one such device, the Voice–in–the–Box, in the general education classroom because it was an inappropriate tool for spontaneous conversation and was too noisy. The ACT Team recommended use of a Tech Speak voice output device for use in the classroom and at home, but neither that device nor any other was ever sent home with IS. The ACT Team recommended continuation of IS' use of her sign language repertoire to increase her intelligibility. However, IS' teacher did not understand sign language, and the Mother was able to teach IS' instructional assistant only some simple signs.

Beginning approximately two weeks after IS started school at NFES, she began to engage in disruptive and impulsive behavior, such as spitting and hitting peers and refusing teachers' directions. On September 24, 2001, Jacquie Pipkin of the FCPS Special Education Staff observed IS in an art class. IS' attention appeared scattered and unfocused. She paid little attention to her teacher. She needed reminders or intervention from her assistant to follow her teacher's directives. Ms.

Pipkin recommended development of a plan for IS to adapt to school routines and procedures and to develop increased independence and longer periods of sustained attention. She also recommended a behavior intervention plan. Finally, Ms. Pipkin noted that the assistant support services were interfering with IS' adjustment to the school environment and delaying the development of independence.

At an IEP Team meeting on October 16, 2001, Ms. Pipkin reviewed her classroom observation with the Team. Ms. Clagett confirmed that IS had become more physical with other students in the classroom and had been spitting on students. Ms. Clagett noted that IS had made academic progress, but that she required frequent redirection. The Parents responded to the behavior problems by keeping IS at home for the first two weeks of November 2001. FCPS implemented a Behavior Intervention Plan ("BIP") on or about November 7, 2001. On November 8, 2001, the IEP Team reconvened to draft IEP goals in the area of self-management. At the meeting, the Mother advised the IEP Team that, in her view, IS was acting out because her sensory and communication needs were not being met. She expressed concern that a regular education classroom was not an appropriate placement. Ms. Clagett reported that IS had been working on a first grade curriculum and had met or come close to meeting many of the first grade standards.

Notwithstanding IS' difficulties with her attention span and impulsive behavior, FCPS sent Quarterly IEP Goals Reports on November 15, 2001 and February 5, 2002, indicating that IS was making sufficient progress toward achieving her IEP goals by the annual review date. On January 16, 2001, Ms. Clagett noted that IS' kicking and spitting had decreased and that she had progressed in the areas of reading and writing. However, IS was

having difficulty accepting consequences for her behavior and seemed impulsive and frustrated. The Mother expressed concerns about IS' social adjustment.

On February 7, 2002, IS was evaluated by an Occupational Therapist, who reported that IS had progressed in her language skills. IS was able to construct four- to six-word sentences with task breakdown and instructions repeated. She was able to copy near and far points. She printed upper and lower case letters legibly with four letters that required repeated practice for proper formation. However, she continued to be distracted in the classroom. The therapist recommended physical and oral motor strategies as a warm-up and to decrease her drooling.

On February 12, 2002, the IEP Team convened an annual review meeting. Of the fifty-four objectives on the 2001–02 IEP that had been introduced, IS had achieved nineteen, made progress on twenty-seven, and not achieved eight. The IEP Team considered a draft IEP for 2002–03, which reduced occupational therapy to consultative services and increased speech and language services from one and one-half hours per week to two hours per week. The Mother stated that if progress continued, IS should remain at NFES, but if progress discontinued, the Team should review an alternative setting. The final IEP for 2002–03 consisted of five hours of special education per week, two hours of speech/language per week, an occupational therapy consult, a special education assistant for thirty-two hours per week, and an ACT consult. Mrs. Ford stated on the IEP document that IS was making nice progress in the identified areas of weakness, including vocabulary, auditory processing, and oral-motor skills. She further stated that IS had recently begun to make noticeable gains in intelligibility of speech during reading and in increasing the

lengths of her spoken sentences. Some objectives in the 2001–02 IEP that IS had not met were not carried over to the 2002–03 IEP.

On April 18, 2002, FCPS issued a Quarterly IEP Goals Report stating that IS was making sufficient progress toward achieving the goals by the annual review date. At a May 9, 2002 IEP Team meeting, Ms. Clagett stated that IS had made slow progress academically and had not met first grade benchmarks. IS was at a pre-primer two level in reading and written language. Although hitting and spitting incidents had decreased significantly, IS' attention and impulsiveness remained a concern. Mrs. Ford stated that IS had made progress with oral motor activities and could articulate two or three word sentences. IS' occupational therapist, Tammy Moser, stated that IS had improved in her writing skills and was self-correcting. IS' mother indicated that IS' behavior had improved. However, she expressed concerns that IS had not been provided appropriate communication support at NFES and was academically behind and unable to progress at the rate of her peers. She opined that IS would be better off in a self-contained, language-based program and requested FCPS to fund IS' placement at the Ivymount School, a private school in Rockville, Maryland. The IEP Team refused and recommended continued placement of IS at NFES at the May 9 meeting. It indicated that it would adjust IS' special education hours if necessary to meet her academic needs in second grade.

On May 31, 2002, on behalf of IS and the Parents, Sheila Iseman, Ph.D., observed IS in her classroom at NFES. Dr. Iseman testified that, although she was seated very close to IS and had listened to children with articulation problems for thirty-three years, she had a very difficult time understanding IS' utterances. On June 3, 2002, the ACT Team observed IS. It found that IS' speech deteriorated when she attempted to share information about which the context was not known to the listener. The Team found that IS' "speech, including intelligibility, pronunciation, and sentence length, improved when words and pictures paired with word[s] were used as visual cues." Bd. Ex. 63. "Vowel sounds and blends were often distorted; however, [IS'] articulation and overall intelligibility appears much improved since the last ACT Team observation of 9/20/01." *Id.* The ACT Team's recommendations were never considered by the IEP Team. The Parents declined to attend an IEP Team meeting in light of the pending administrative hearing.

As of June 2002, IS had achieved four of sixty-seven objectives introduced on the 2002–03 IEP. She had partially achieved thirty-four other objectives.[2] However, on June 7, 2002, FCPS issued a Quarterly IEP Goals Report indicating that IS was making sufficient progress towards achieving her IEP goals. IS' final first grade report card, which was prepared by Ms. Claggett, reported that IS had achieved all "outstandings" and "satisfactories" in academic areas. In the areas of work and social habits, IS showed improvement in only two categories. Ms. Claggett testified that IS' grades were not based on the first grade curriculum, but rather on IS' IEPs. Despite IS' failure to achieve many of the objectives in the IEP, FCPS promoted IS to the second grade.

Another expert retained by the Parents, Susan Van Ost, Ph.D, conducted a formal educational and neuropsychological assessment of IS between May 30, 2002 and June 30, 2002. Three of IS' first grade teachers

---

2. The nature and extent of IS' progress with respect to these objectives is not clear from the IEP or the testimony of the witnesses at the due process hearing.

provided information to Dr. Van Ost. IS' test scores placed her in the second percentile with respect to reading, spelling, writing, speed of math calculation, receptive and expressive language and auditory perception and memory. Dr. Van Ost found these scores to be consistent with a disability range for an individual with a full-scale IQ of eighty-four. Comparison of the scores obtained during the assessment with the scores generated by FCPS as the result of its testing in 2000 and 2001 showed little or no change in IS' skills during the 2001–02 school year. Dr. Van Ost recommended that IS be placed in a full-time, highly individualized and intensive special education program emphasizing total communication techniques, multisensory presentation of information, and extended school year services.

On July 25, 2002, the Parents filed a request for a due process hearing, contending that the proposed placement at NFES for the 2002–03 school year was inappropriate. They requested placement of IS at the Ivymount School, compensatory education, and payment of attorneys' fees and expenses. On August 9, 2002, FCPS sent notice to the Parents of the scheduling of an IEP Team meeting for August 20, 2002 to review the June 3, 2002 ACT Team report and the Van Ost report. The parties were unable to schedule the IEP Team meeting prior to the date scheduled for the due process hearing. The hearing occurred before Judge Alan B. Jacobson on August 22 and 23, and September 13 and 17, 2002. Judge Jacobson denied IS' claims for compensatory education related to the 2000–01 and 2001–02 school years.[3] Judge Jacobson ruled that IS' 2002–03 IEP with placement in a general education classroom at NFES was

not reasonably calculated to provide her with a free appropriate public education ("FAPE"), as required by the IDEA. He consequently ordered FCPS to fund a private placement of IS at the Ivymount School or another nonpublic school for the remainder of the 2002–03 school year. FCPS subsequently brought suit in this Court seeking review of the ALJ's decision.

### *Discussion*

#### A. *The Individuals with Disabilities Education Act*

 The IDEA requires all states that receive federal funds for education to provide each child between the ages of three and twenty-one, who has a disability, with a free appropriate public education. 20 U.S.C. § 1412(a)(1)(A). The FAPE must provide a disabled child with meaningful access to the educational process. *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 192, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) ("[I]n seeking to provide ... access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful."). In other words, the FAPE must be reasonably calculated to confer some educational benefit on the disabled child. *Id.* at 207, 102 S.Ct. 3034. Such benefit must be provided in the least restrictive, appropriate environment, with the disabled child participating, to the "maximum extent appropriate," in the same activities as his or her non-disabled peers. 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.550 ("Each public agency shall ensure ... (2) That special classes, separate

---

3. Defendants have not appealed that portion of Judge Jacobson's ruling. Defendants thus characterize the sole issue presented on appeal as whether IS' 2002–03 IEP, which rec-

ommended continued placement at North Frederick Elementary School ("NFES"), was reasonably calculated to provide her a FAPE.

schooling or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes cannot be achieved satisfactorily."); *DeVries v. Fairfax County Sch. Bd.*, 882 F.2d 876, 878 (4th Cir.1989) ("mainstreaming of handicapped children into regular school programs ... is not only a laudable goal but is also a requirement of the Act").

█ The IDEA does not, however, require a school district to provide a disabled child with the best possible education. *Rowley*, 458 U.S. at 192, 102 S.Ct. 3034. Although a state must "provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child," the IDEA "does not require the furnishing of every special service necessary to maximize each handicapped child's potential." *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir.1997) (internal quotation marks and citations omitted).

To assure the delivery of a FAPE, the IDEA requires a school district to provide an appropriate Individualized Education Program ("IEP") for each child determined through evaluation to be learning disabled. 20 U.S.C. § 1414(d). Preparation of the IEP requires the collaboration of an IEP Team consisting of the child's parents, one of the student's regular teachers, a special education teacher, a representative of the school board, an individual who can interpret evaluation results, and, where appropriate, the disabled child. *See* 20 U.S.C. § 1414(d)(1)(B). The United States Court of Appeals for the Fourth Circuit has recently noted that, "[a]n appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress."

*MM v. School Dist. of Greenville Co.*, 303 F.3d 523, 527 (4th Cir.2002) (citing 20 U.S.C. § 1414(d)(1)(A)).

The IDEA also establishes procedural safeguards to "ensure that the parent or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to those decisions." *Id.* (internal quotation marks and citations omitted); *see also* 20 U.S.C. § 1415 (safeguards). If the parents are not satisfied with the IEP, they may "present complaints with respect to any matter related to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such a child," 20 U.S.C. § 1415(b)(6), and may thereafter request a due process hearing conducted by the state or local educational agency, *id.* § 1415(f). Under Maryland law, the Maryland Office of Administrative Hearings conducts the due process hearing. Md.Code Ann., Educ. § 8–413; Md. Regs.Code tit. 13A, § 05.01.15. An aggrieved party may then appeal the administrative ruling to federal or state court. Md.Code Ann., Educ. § 8–413(h).

### B. *Standard of Review*

█ The Fourth Circuit has recently articulated the appropriate standard of review with respect to motions for summary judgment in an IDEA case:

> In a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified de novo review, giving "due weight" to the underlying administrative proceedings. In such a situation, findings of fact made in administrative proceedings are considered to be *prima facie* correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute [its] own notions of sound educational policy for those of local school authorities ....

*MM*, 303 F.3d at 530–31. Specifically, the Court must follow the two-step inquiry articulated in *Rowley*. *See* 458 U.S. at 206, 102 S.Ct. 3034. First, the Court must determine whether the state or local educational authority complied with the procedures set forth in the Act. *Id.* Second, the Court must determine whether the IEP was reasonably calculated to enable the child to receive educational benefits. *Id.* at 207, 102 S.Ct. 3034. As the party challenging the administrative findings, FCPS bears the burden of proof of establishing a violation of the IDEA. *Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 152 (4th Cir.1991), *cert. denied*, 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991); *Cavanagh v. Grasmick*, 75 F.Supp.2d 446, 457 (D.Md.1999).

■ The Court's analysis, which is therefore in the nature of "summary adjudication," necessarily involves a review of the administrative record, as well as additional evidence, if the parties so request. The Court must make a "bounded independent decision based on the preponderance of the evidence, giving 'due weight' to the state proceedings." *Cavanagh*, 75 F.Supp.2d at 457 (citing *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir.1991)). "If the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct." *Id.*

In addition, the Court's analysis is shaped by the mandate of Rule 56(c) of the Federal Rules of Civil Procedure that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "When the moving party has met its responsibility of identifying the basis for its motion, the non-moving party must

come forward with 'specific facts showing that there is a genuine issue for trial.' " *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir.1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(e)). The Court's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant resolution of the matter at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where, as here, cross-motions for summary judgment are filed, a court must "evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir.1987).

## C. *FCPS's Compliance with the Procedural Requirements of the IDEA*

The Administrative Law Judge found that "FCPS failed to follow the procedural requirements of IDEA before recommending a school community based program at [NFES]." Decision at 40. Specifically, the ALJ found that FCPS failed to comply with the requirements of 34 C.F.R. § 300.533(2) by failing to consider information concerning IS from a variety of sources in its placement decision. *Id.* 40 ("IDEA placement procedures as outlined at 34 C.F.R. § 300.533(2), require the public agency to carefully consider information from a variety of sources and to ensure that information obtained from all of these sources is documented and carefully considered. The evidence in this case estab-

lishes that FCPS failed to carefully consider the information concerning the Student in its placement decision."). However, in discussing the Parents' contention "that the IEP was procedurally non-compliant because it was not developed in a timely [manner] and that the placement decision was made by individuals who lacked adequate knowledge of the Child and without meaningful participation by the Parents," the ALJ found that "the procedural defects are not sufficient of themselves to support a finding that FAPE was denied." *Id.* at 32.

The ALJ's reference to § 300.533(2) was likely an inadvertent misnomer. The intended section, 34 C.F.R. § 300.535(a), requires FCPS, in interpreting evaluation data for the purpose of determining IS' educational needs, to "(1) [d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, teacher recommendations, physical condition, social or cultural background, and adaptive behavior; and (2)[e]nsure that information is obtained from all of these sources is documented and carefully considered."

■ The record does not support a finding or an inference that FCPS did not adequately involve the Parents in the preparation of IS' proposed 2002–03 IEP. The Mother attended the annual review meeting on February 12, 2002, at which the goals and objectives of the 2001–02 IEP and the draft 2002–03 IEP were reviewed. Bd. Ex. 56. Although the Parents had previously expressed concerns about IS' placement in regular education at the November 8, 2001 IEP Team meeting, *see* Tr. 448–49, the Mother, at the February 12 meeting, "shared that if continued progress is noted, they would like to continue having [IS] attend North Frederick." Bd. Ex. 56 at 5. However, the Mother stated that, "[i]f progress discontinues, she would like the team to review

an alternative setting." *Id.* In addition, the Mother asked the IEP Team to "consider the possibility of a closed classroom." *Id.* The Parents approved the IEP, approving the goals and objectives and their implementation at NFES. Bd. Ex. 57 at 3.

■ The record similarly does not support the ALJ's finding that FCPS did not consider information from a variety of available sources when preparing the 2002–03 IEP. For example, the IEP Team recommended a reduction in occupational therapy services from thirty minutes per week to consultative services based upon the written recommendations of IS' occupational therapists. *See* Bd. Exs. 55 and 56. At a meeting on January 16, 2001, prior to the development of the 2001–02 IEP, the IEP Team reviewed and considered the results of the September 12, 2000 psychological assessment, the October 23, 2000 physical therapy assessment, the November 3, 2000 educational assessment, the November 6, 2000 occupational therapy assessment, the November 29, 2000 ACT Team report, and the January 17, 2001 speech, language and auditory assessment. Bd. Ex. 19; Tr. 396, 774. These assessments remained relevant to the 2002–03 IEP and, in fact, were indispensable to Dr. Van Ost's conclusion that IS did not progress during the 2001–02 school year.

At the time the 2002–03 IEP was prepared, the IEP Team did not have, and thus could not have considered, information derived from the Parents' consultation with Dr. Sheila Iseman (who observed IS on May 31, 2002), the ACT Team Follow-up Observation Report (based on its observation of IS on June 3, 2002 and telephone communication with the Mother on June 21, 2002), or the Educational and Neuropsychological Evaluation prepared by Dr. Van Ost. Defendants provided the latter report to FCPS for the first time on Au-

gust 9, 2002 as part of their disclosure in the due process hearing.

▮▮▮▮▮▮ In their Reply, Defendants appear to accept that FCPS considered information from all available sources, including themselves. Rather, Defendants argue only that FCPS committed procedural violations by (1) offering the 2002–03 IEP without documenting the information and sources it considered, in violation of 34 C.F.R. § 300.535(a); and (2) failing to document its reasons for rejecting a private placement when the Parents requested the same on May 9, 2002, in violation of 34 C.F.R. § 300.503. Reply at 7. FCPS does not dispute that these violations occurred. As the ALJ correctly noted, failure to comply with the IDEA's procedural provisions may be a sufficient basis for a finding that the local educational agency failed to provide a student with a FAPE. *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 634 (4th Cir.1985).

Here, however, FCPS's failure to fully document its decision-making process did not materially affect the development of the 2002–03 IEP. Similarly, FCPS's failure to explain its refusal of the Parents' request that it fund IS' placement in a private school had no impact on whether the 2002–03 IEP adequately assured IS of a FAPE. *Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir.1990). Therefore, the Court agrees with the ALJ that the procedural violations at issue are insufficient to support a finding that FCPS failed to provide IS a FAPE.

### D. Whether the 2002–03 IEP Was Reasonably Calculated to Enable IS to Receive Educational Benefits

The ALJ concluded that the 2002–03 IEP, which proposed placement in a general education class at NFES for most classes, was not reasonably calculated to provide IS with a FAPE in the LRE, because it "is virtually the same formula which resulted in the Child making no, or trivial[,] progress for the 2001–02 school year." Decision at 40. The decision rests on predicate conclusions that (1) IS made only *de minimis* educational progress at NFES during the 2001–02 school year, and (2) the 2002–03 IEP is substantially similar to the 2001–02 IEP. The ALJ's conclusion that IS made little or no progress during the 2001–02 school year is supported by evidence in the record.

### 1. Inappropriateness of Placement in the Regular Education Classroom

▮▮▮▮ IS' behavior and distractibility in the general educational setting during the 1999–2000 and 2001–02 school years demonstrates the inappropriateness of an inclusive placement for the 2002–03 school year. During the 1999–2000 school year, IS attended kindergarten at Taylor Elementary School in Arlington, Virginia. Finding of Fact 4(a)[4]; Tr. 40, 83. She received special education services in a "countywide augmentative education" program, pursuant to an IEP that classified her as having developmental disabilities. Finding of Fact 4(b). She spent most of her day in a regular education classroom with twenty-five children. App. Ex. 1; Bd. Ex. 1 at 1; Tr. 41. Due to her auditory and visual distractibility, IS had significant difficulties focusing on activities. Finding of Fact 7. Moving her to a separate table was only moderately successful, and IS demonstrated difficulty concentrating on activities even in a separate therapy room. *Id.* During physical education, IS often became distracted by the liveliness and commotion of her classmates and interrupted her own movements to watch

---

4. The ALJ's Findings of Fact on pages 7 and 8 of the Decision are numbered 1, 2, 3, 4, 3, 4 .... For the sake of clarity, the Court will renumber the findings 4(a), 4(b), and 4(c).

them. App. Ex. 23. This caused her teachers concern for the safety of IS and her classmates. *Id.* IS also displayed problematic behavior, including disruptive behaviors and aggression towards other students. Finding of Fact 11; App. Ex. 22 at 12–13; Tr. 41. According to the Mother, the classroom environment proved to be stressful for IS and had a negative effect on her well-being. App. Ex. 1.

IS returned to the classroom setting at NFES at the start of the 2001–02 school year, following a year of home-schooling. Within two weeks, she began to engage in impulsive and disruptive behavior such as spitting and hitting peers and refusing teachers' directions. Finding of Fact 37; App. Exs. 13, 16, 29; Tr. 57, 90, 94. On September 24, 2001, Jacquie Pipkin of the NFES Special Education staff observed IS in an art class. Her attention appeared scattered and unfocused, she needed reminders or intervention from her assistant to follow the teacher's instructions, and "there did not seem to be transfer from one situation to another in terms of adhering to procedures or routines." Finding of Fact 34; App. Ex. 15. In addition, the observer noted that IS had become accustomed to responding to teacher requests after two or three reminders. App. Ex. 15. Her teachers were concerned that she was increasingly copying negative behaviors. *Id.* As of the observation, IS was in need of a plan to assist her in adapting to school routines and procedures with strategies to develop increasing independence and longer periods of sustained attention. *Id.;* Finding of Fact 35. She needed structured guidance, with rewards for appropriate and immediate responses, and a behavior intervention plan. *Id.*

In response to IS' disruptive behavior, the Parents kept IS at home for the first six school days of November 2001. Finding of Fact 38; App. Ex. 16; Tr. 57, 94, 610. NFES staff implemented a Behavior Intervention Plan which called for the use of "stop and think" and "time-out" strategies to improve IS' behavior. Finding of Fact 38; App. Exs. 14, 16. At the IEP Team meeting on November 8, 2001, the Mother stated that, in her view, IS was acting out because her sensory and communication needs were not being met at NFES.App. Ex. 14; Tr. 59–63. She expressed her concern that a regular education classroom was not an appropriate placement. *Id.* IS' behavior throughout the school year remained more problematic than it had been during previous years. App. Ex. 28, Tr. 63, 165. In her report, Dr. Van Ost diagnosed IS with a limited attention span, limiting her ability to profit from academic instruction, and making highly individualized, multisensory teaching essential to her development. Finding of Fact 50(k); App. Ex. 22 at 8–9.

Thus, the Court has no hesitation in ruling, based on the record presented to the ALJ, that IS' placement in a mainstream setting at NFES was not reasonably calculated to provide her educational benefit. The Court's decision is bolstered, however, by the narrative summary of the County IEP Team meeting held on April 23, 2003. At that meeting, NFES Principal Grason Jackon "explained that, while [IS'] [2002–03] IEP could be implemented at NFES [during the 2003–04 school year], he had concerns regarding the open classroom environment . . . and the degree to which that environment would interfere with [IS'] ability to access her education there." Defs.' Mem. in Opp. to Pl.'s Mot. for Summ. Jgm., Ex. 3. "The County IEP Team agreed that, due to [IS'] easy distractibility and difficulty maintaining her attention to tasks, a school environment with closed classrooms was needed for her." *Id.* Notwithstanding the benefits to be derived from interactions with her nondisabled peers, because of the nature and extent of her disabilities, IS is patently not

the "poster child for inclusion." *See* Tr. 500.

### 2. *Effect of the Special Education Assistant*

The presence of a special education assistant during the 2000–2001 school year impeded IS' transition from her home environment to a structured school setting and discouraged her from becoming independent. In a report of her September 24, 2001 observation, Jacquie Pipkin stated that, "[t]he support of a special education assistant does not appear to have enabled [IS] to develop independence and a sense of responsibility." App. Ex. 15. Ms. Pipkin recommended that the IEP Team consider "whether assistant support services are interfering with [IS'] adjustment to the school environment and delaying the development of independence." *Id.*

FCPS's Special Education Coordinator, Lisa Lawrence, testified that instructional assistants are "very restrictive" and "can interfere with [a child's] interactions with peers." Tr. 418–19, 434, 497. Although the provision of an assistant was designed to facilitate IS' transition to the public school setting and be a temporary measure, Tr. 419, 498–99, the assistant remained with IS during the entire 2001–2002 school year. Provision for the assistant for thirty-two hours each week was included in the 2002–03 IEP. *See* Finding of Fact 46, Bd. Ex. 57.

Stephanie de Sibour, the Assistant Director of the Ivymount School testified that an instructional assistant would not be necessary if IS were placed at that school. Tr. 308. She also opined that a dedicated aide in a regular education setting is more restrictive than placement at Ivymount, because the aide limits the student's opportunities for social interaction and is stigmatizing. Tr. 309–10.

Dr. Sheila Iseman testified that when she observed IS in the classroom, IS was sitting in the last row, and her view of the teacher was blocked by the instructional assistant, who was sitting directly in front of her. Tr. 124. Dr. Iseman opined that the presence of the assistant in the general education setting was detrimental to IS:

Q: Do you feel that it is appropriate for [IS] to have a one-on-one aide?

A: I feel it needs to be an appropriate environment. A highly structured environment with a low student-teacher ratio and intensive staffing, not a one-to-one aide. A one-to-one aide for her is analogous to putting a bandage on a wound rather than figuring out what is making it bleed. For her an aide controls what can be seen as volitional or purposeful types of behaviors. For her the attempt is to bring the environment closer, and that is a great goal; but for her it adds more auditory input, which is the last thing she needs. It adds more of a distraction. It makes her more of a social pariah. I agree with Ms. Pipkin that it reduces her independence.

Tr. 174. Thus, the documentary evidence and testimony of the above witnesses supports the ALJ's finding that "there were signs that the assistant support services, *i.e.*, the efforts of the special education assistant assigned to the Child, were interfering with her adjustment to the school environment and delaying the development of independence." Decision at 36.

### 3. *IS Did Not Make Meaningful Academic Progress on Her 2001–02 IEP*

The ALJ concluded that FCPS "failed utterly to demonstrate meaningful educational progress made by [IS] since the 1999–2000 school year report card from Arlington." Decision at 35. Specifically, the ALJ found that, during the 2001–02 school year, IS' writing skills remained

below the first grade level. *Id.* at 32. Additionally, the ALJ found that, "in the two-year period between kindergarten and the proposed second grade placement, [IS'] writing level has not advanced even one grade level and that in that time there is little or no information to show that she has advanced at all in academic subject matters." *Id.* Upon consideration of the entire record, this Court concurs with Judge Jacobson's conclusion that IS failed to make meaningful academic progress during the 2001–02 school year.

**Reading.** With respect to IS' reading skills, her June 2000 report card from Taylor Elementary School stated that IS could identify all of the letters of the alphabet and several important words with picture symbols every time she was asked. App. Ex. 23. She could read some words without picture symbols to cue her. *Id.* During the summer of 2000, she concentrated on identifying words written on index cards without picture symbols and words accompanied by picture symbols. App. Ex. 24. The FCPS Educational Assessment dated November 3, 2000 identified IS' readiness skills for reading as a relative strength, rating her within the 5.3 to 6.3 years range. Bd. Ex. 14. IS recognized twenty sight words in isolation (but occasionally forgot them) and a few words in context in books and on the computer. *Id.* She could point to pictures beginning with the letters P, B, T, D, K, G, L, M, and N. *Id.* Lisa Lawrence testified that these skills were nowhere near the first grade level. Tr. 411.

IS' first grade teacher, Erin Clagett, testified that, at the end of the 2001–02 school year, IS' reading had progressed only from a level A, the "basic level of little books," to a level C book. Tr. 592. Ms. Clagett testified that "a level C little book would be in relation to what we call PP 1 [pre-primer one], which is like before primer in first grade." Tr. 593. She also testified that both level A and level C were at a first grade level, and were distinguishable by the number of words and the vocabulary involved. Tr. 592.

Significantly, IS achieved none of the three reading goals contained on her 2002–03 IEP, which involved demonstrating sight word recognition of selected words at a first grade level in context and isolation, reading books containing the target sight word vocabulary, and consistently identifying the letter for selected consonant and vowel sounds. IS also failed to achieve any of the seventeen reading goals contained on her 2002–03 IEP between February and June 2002, although the record is clear that she was working on three goals similar to the 2001–02 IEP goals. Bd. Ex. 57. The remaining goals were introduced during that period. *Id.* Measured against the IEP and grade-level benchmarks, the Court does not find that IS made meaningful academic progress in the area of reading during the 2001–02 school year.

**Math.** With respect to her math skills, at the end of the 1999–2000 school year, IS could rote count to twenty, recognize the numerals 1–20, and add groups of manipulatives with a sum of ten. App. Ex. 23. She could recognize the coins penny, nickel, and dime. *Id.* However, her teacher noted that, "the more she works with them, the less consistent she is." *Id.* During the five weeks that IS attended ESY in the summer of 2000, she worked on addition and subtraction on paper as well as the chalkboard. App. Ex. 24. She attempted to write answers, but reversed some numbers (2, 4, 5) when she wrote them. *Id.* She was able to fill in missing numbers in a sequence of one through ten. *Id.* She could complete patterns of ab, abc, aabb and enjoyed working with patterns.

The 2001–02 IEP prepared by FCPS noted that IS' skills ranged from 4.0 to 6.3

in the area of basic math on the Brigance test from November 2000. "She counts objects with one to one correspondence, but sometimes skips numbers." Bd. Ex. 25. "She counts to 10 consistently and recognizes the numerals 1 through 9 when presented randomly." *Id.* "She matches sets with numerals to 10 and knows ordinal positions first and last." *Id.* The IEP set goals for IS to rote count aloud from eleven to twenty-five, sequence the numbers one to twenty given a set of randomly mixed number cards, count the number of objects in a set of twenty objects, write the numerals from 1 to 10 given a visual model, add two sets of manipulatives to a sum of ten, subtract two sets of manipulatives from ten, and identify a penny, nickel, and dime when presented with verbal/pictorial prompts. *Id.* Many of these goals were goals that IS was working on in kindergarten. Of these objectives, IS was able to write the numerals from 1 to 10 given a visual model as of November 2001. Bd. Ex. 25. She was able to identify and name a penny on four out of five trials with verbal/pictorial prompts. *Id.* She could not add double-digit numbers. Tr. 594. With respect to the remainder of the goals, IS made only partial achievement. Bd. Ex. 25.

The 2002–03 IEP dropped objectives that involved the use of manipulatives. Bd. Ex. 57; Tr. 550–52. IS' first grade teacher reported, however, that "IS needed manipulatives a lot to help her" in math, and that providing them was beneficial to IS. Tr. 594, 635–37. The 2002–03 IEP called for IS to work on addition only up to the number ten and subtraction from the number ten using a number line. Bd. Ex. 57. Despite some success with addition using manipulatives during kindergarten, IS had not achieved the goal of adding manipulatives to a sum of ten by February 2002. Bd. Ex. 57; App. Ex. 23. By June 2002, IS had only partially achieved goals of "reading ordinal numbers first through

tenth" and matching sequences or patterns of blocks or beads. Bd. Ex. 57. Dr. Van Ost opined, based on the results of IS' math tests, that IS' "math reasoning was . . . heavily dependent on visual support." App. Ex. 22 at 22. "Her concept of how to proceed was stronger than her calculation skills because of [IS'] difficulty with the . . . spatial aspects of counting one-by-one." *Id.* IS did not achieve any of the thirteen goals on her 2002–03 IEP between February and June 2000. Bd. Ex. 57. The Court does not find that IS' performance in math during the 2001–02 school year constituted meaningful academic progress.

**Written Language.** As of the summer of 2000, IS was able to write her first and last name using a mix of upper and lower case letters. App. Ex. 24; Tr. 153. The ALJ concluded that, based on the results of her February 7, 2002 evaluation by Catherine Johnson, an Occupational Therapist at FCPS, IS made "marked progress in her written language skills." Finding of Fact 44; Bd. Ex. 55. IS was able to construct four to six-word sentences with tasks broken down and repeated directions. *Id.* She was able to "copy near and far point[s], up to 12–15' independently." *Id.* She printed all upper and lower case letters legibly with four letters (b,d,y,f) that required repeated practice for proper formation. *Id.* As long as IS took her time, her writing was legible. Finding of Fact 57. IS' first grade teacher testified that IS' handwriting was one of the things that improved the most during the 2001–02 school year. Tr. 596, 602, 635, 783–84.

As a result of this improvement, on February 12, 2002, the IEP Team recommended that IS' occupational therapy services be reduced from one-half hour per week of direct services to consultative services only. Bd. Ex. 57. IS' mother testi-

fied that IS' handwriting regressed following the reduction in services. Tr. 69–70, 73. Evidence of regression is corroborated by test results compiled by Dr. Van Ost in May and June 2002, which indicated that, by the end of the 2001–02 school year, IS was only functioning at the two percentile level of children her age in the area of writing. Tr. 153; Finding of Fact 51; App. Ex. 22 at 9. Dr. Van Ost noted that IS lacked sufficient visual-motor control to trace along a dotted line, that she was able to write some, but not all, single letters and a few two- and three-letter words to dictation, but not longer letter strings. App. Ex. 22 at 23. She was unable to formulate and write complete sentences.[5] *Id.* At the end of the 2001–02 school year, IS had achieved only two out of four written language objectives on the 2001–02 IEP and none in her 2002–03 IEP. The Court finds that IS' progress in writing during the 2001–02 school year was not meaningful.

**Speech and Language.** On January 17 and 24, 2001, FCPS administered a Speech, Language, and Auditory Assessment to IS.App. Ex. 27. On the Expressive and Receptive One–Word Picture Vocabulary Tests, which measured her ability verbally to identify a given picture and verbally to identify a picture from among a group of pictures, respectively, IS scored in the first percentile. *Id.* On the Test of Language Development, which addresses areas of oral vocabulary, grammatic understanding, sentence imitation, and grammatic completion, IS scored no higher than the second percentile, significantly below her cognitive ability level. *Id.* On the Test of Auditory–Perceptual Skills, which tests a child's ability to process information presented orally and to respond to tasks, IS scores ranged from between the one-tenth

percentile to the fifth percentile, with one exception. *Id.* On the subtest for auditory interpretation of directions, IS scored in the twenty-fifth percentile. *Id.* On the Goldman Fristoe Test of Articulation, which tests speech production in single words and sentences, IS "was difficult to understand due to significant misarticulations in all positions of words." *Id.* Finally, on the Informal Test for Apraxia of Speech, IS was determined to have difficulty with volitional verbal and non-verbal movements of her oral structure. *Id.* She was diagnosed with a moderate language disorder. *Id.* "Her attained language abilities are below the normal limits for her cognitive abilities." *Id.* She was also diagnosed with a severe articulation disorder, which has a "significant impact on her social, emotional, and academic functioning." *Id.* The 2001–02 IEP provided IS with one and one-half hours per week of speech-language therapy and a consult with the FCPS ACT Team.

Karen Rushing, one of the ACT Team co-leaders, testified that IS' expressive language was difficult to understand to a trained listener and to unfamiliar listeners, but that, in a structured setting, IS' speech was intelligible to both trained and familiar listeners. Tr. 672. Ms. Rushing testified that, by June 2002, IS had advanced in her ability to produce sentences, but that she still did better in a very structured situation and with visual clues. Tr. 673; Finding of Fact 47. Ms. Rushing also noted that IS had trouble at a conversational level, because she was trying to generate unpredicted information with multi-syllable words. *Id.* Finally, Ms. Rushing testified that IS required work on her articulation and oral motor skills in a one-to-one set-

---

**5.** Lisa Lawrence testified that, as of the end of the 2001–02 school year, IS was able to independently write a three-word sentence, with the prompting of her assistant, in five to ten minutes. Tr. 634–35.

ting in the speech therapy room. Tr. 674; Finding of Fact 48.

By the end of the 2001–02 school year, IS had achieved only five out of thirty-one speech and language objectives in her 2001–02 IEP and four out of thirty-four objectives in her 2002–03 IEP. Bd. Ex. 25; Bd. Ex. 57. The 2002–03 IEP states that IS had progressed in the areas of vocabulary, auditory processing, and oral motor skills and "has recently begun to make noticable gains in intelligibility of speech during reading and in increasing lengths of spoken sentences." Bd. Ex. 57 at 1. However, at a May 9, 2002 IEP meeting, IS' speech-language pathologist, Beverly Ford, reported that IS was able to speak predominantly in two- to three-word sentences. App. Ex. 26.

The report of Dr. Van Ost undermines FCPS's statement on the 2002–03 IEP and confirms that IS did not demonstrate meaningful progress in speech and language. Dr. Van Ost noted IS' expressive language deficiencies as follows:

> [IS] speaks in phrases of one to four words. She uses some nouns and verbs but few pronouns, articles, or prepositions. Her speech was often unintelligible unless interpreted by her mother. When repeating phrases presented in the context of an illustrated story, [IS'] utterances were accompanied by gestures and facial expressions which indicated that she understood what to say but was unable to produce the sounds. She exhibited retrieval problems which slowed the rate at which she was able to call up words appropriate to the task. ... [IS] misarticulates for reasons of short-term memory and incoordination of the oral musculature. When imitating tongue-twisters, it was apparent that certain speech sounds are particularly difficult for [IS] to articulate .... She had marked difficulty transitioning from the articulation of one word or syllable to the next, so that "tick tock" was "tick guh." Short-term memory deficits contributed to [IS'] misarticulations because she was unable to remember a sequence of four or more syllables.

App. Ex. 22 at 6. Thus, the Court finds that IS did not achieve significant progress during the 2001–02 school year in the area of speech and language.

### 4. *Resignation to IS' Developmental Delay*

■■■ Judge Jacobson inferred from the testimony of Lisa Lawrence, the FCPS Elementary Special Education Coordinator, a "certain resignation" by school officials "to [IS'] developmental delay." Decision at 35. The ALJ discredited the testimony of Mrs. Lawrence that, because of IS' central nervous system disorder, she might not progress at the same rate as her non-disabled peers.[6] Tr. 543. The ALJ concluded that FCPS had underestimated IS' ability as the result of its unsupported diagnosis and noted that the record lacked any medical diagnosis of a central nervous system disorder. Decision at 35. IS' mother, however, testified that there was "some agreement between the geneticist and neurologist that [IS] has some central nervous system issue." Tr. 40. Dr. Iseman testified that IS' articulation problems were consistent with "what we see in youngsters who have ... central nervous systems ... that are compromised." Tr. 131–32.

The matter of a diagnosis is not dispositive of the issue of whether or not FCPS

---

**6.** Mrs. Lawrence testified that, because the academic program becomes more challenging as the grades progress, there would probably come a time when IS would not be able to approximate the grade level she was in. Tr. 543–44. The ALJ again noted the lack of "any objective medical evidence for such a pessimistic view ...." Decision at 35.

was resigned to IS' developmental delay, because the record is clear that the 2002–03 IEP did not respond to the absence of progress in the prior school year. FCPS, however, attempts to construe a portion of the Van Ost report as concluding that IS' educational progress was consistent with her level of cognitive functioning. FCPS points to the ALJ's finding, taken verbatim from the Van Ost report, that "a comparison of the attained scores indicated that reading, spelling, writing, speed of math calculation, receptive and expressive language, auditory perception and memory, all fall in the second percentile, consistent with a disability range for an individual with a full-scale IQ of 84." Finding of Fact 51. The record is undisputed that "the disability range for a youngster whose full-scale IQ is 84 would be standard scores of about 70, which is the second percentile." Tr. 735–36. Defendants correctly note that IS is considered disabled because her second-percentile achievement is so highly discrepant from her low-average intellectual ability. *See* Defs.' Reply Ex. 2 at 46–47. Thus, the ALJ was correct in concluding that IS, "although disabled, should be able to make meaningful progress in reading, writing, and mathematics[,]" if provided with proper assistance. Decision at 33.

██ Because the record indicates that IS made little more than *de minimis* progress under the 2001–02 and 2002–03 IEPs during the 2001–02 school year, the ALJ correctly gave little weight to FCPS's Quarterly IEP Goals Reports dated June 13, 2001, September 15, 2001, November 15, 2001, and February 5, 2002, showing that IS was making sufficient progress toward achieving her IEP goals by the annual review date.

### 5. Similarity of the 2002–03 IEP to the Unsuccessful 2001–02 IEP

██ Judge Jacobson found that the 2002–03 IEP was not designed to meet IS' specific educational needs, because "[w]ithout thoughtfully discussing or considering any alternative placement options, FCPS proposed that [IS] be placed at North Frederick Elementary in a general education class for most classes for the 2002–03 school year." Decision at 39–40. Judge Jacobson held that "[t]hat is virtually the same formula which resulted in the Child making no, or trivial[,] progress for the 2001–2002 school year." *Id.* at 40. The latter conclusion is supported by the evidence in the record.

The 2002–03 IEP recommended promotion of IS to the second-grade general education classroom at NFES. Like the first grade classroom, the second grade classroom is an open classroom[7] with more than twenty students. Tr. 74, 143, 173. There were approximately sixteen students in IS' first grade class. IS' mother and Dr. Iseman testified that the increased noise and activity levels in the setting would exacerbate IS' distractibility and behavior problems. *Id.* At a County IEP Team meeting on April 23, 2003 to discuss IS' extended school year program at Ivymount School and to determine her placement for the 2003–04 school year, NFES Principal Grason Jackson voiced "concerns regarding the open classroom environment at NFES and the degree to which that environment would interfere with [IS'] ability to access her education there." Defs.' Cross–Mot. and Opp. Ex. 3. The County IEP Team agreed that, "due to [IS'] easy distractibility and difficulty maintaining attention to tasks, a school

---

7. The term "open classroom" refers to the fact that classes are segregated by uninsulated dividers or partitions, not individual classrooms with four walls and a door. Tr. 74, 143, 173.

environment with closed classrooms was needed for her." *Id.*

The 2002–03 IEP also recommended the continued use of an educational assistant for thirty-two hours per week. Lisa Lawrence, the FCPS Special Education Coordinator testified that the presence of an assistant has a stigmatizing effect and limits a student's ability to interact with her peers. Tr. 418–19, 434, 497. FCPS did not consider whether an alternative setting not requiring the presence of an assistant could provide IS with an opportunity to interact with and to model the behavior and communication of her non-disabled peers. From the record, it appears that such a placement was not contemplated until April 2003.

Although IS had been enrolled at NFES since the beginning of the 2001–02 school year, and FCPS had tested IS and had approximately five months to observe her academic progress under the 2001–02 IEP, the 2002–03 IEP did not adequately take into account IS' disability and ability to learn in the general educational setting. The IEP does not implement the recommendations made by the ACT Team in its November 29, 2000 and September 20, 2001 reports. The ACT Team requested that a description of assistive devices, computer access, and software be included in IS' speech therapy goals and objectives. Bd. Ex. 37. Although the ACT Team recommended the use of sign language (modified as necessary to accommodate IS' needs) to enhance IS' intelligibility, IS' assistant and classroom teacher were untrained in sign language. Communication boards with picture symbols were not used in the classroom to help IS access the curriculum. Rather, picture books and cues were used to remind IS of the names of her classmates and rules she needed to follow. Tr. 606. Use of a voice output device was used only occasionally in the general education classroom. Tr. 605.

In addition, despite IS' persistent difficulties with articulation, the IEP recommended only a slight increase in the amount of speech and language therapy, from one and one-half hours per week to two hours per week, and the same level of special education pull-out services, five hours per week. The IEP Team failed to give much weight to the Parents' statements that IS had functioned well in a special education environment in her previous school. Bd. Ex. 46. The IEP recommended reduction of occupational therapy services from one-half hour per week to consultation. IS' handwriting regressed following the reduction of those services. The IEP failed to provide for any physical therapy services, despite the Team's knowledge that IS has an unusual gait, difficulty walking, and was prone to falling. Bd. Exs. 27, 31; Tr. 630. Finally, the IEP Team dropped unachieved objectives from the 2001–02 IEP, such as using manipulatives to add and subtract numbers, when IS had not yet mastered those skills.

IS' performance with respect to the 2002–03 IEP goals shows the inappropriateness of that plan. Between February 2002 and June 2002, IS achieved only four of seventy-nine goals listed. Bd. Ex. 57. For the foregoing reasons, the Court concludes that the 2002–03 IEP was not reasonably calculated to provide IS with educational benefit.

### 6. *FCPS's Arguments with Respect to the Van Ost Report*

 FCPS argues that Dr. Van Ost's report should have been given little or no weight by the ALJ because Dr. Van Ost did not testify at the hearing. FCPS correctly concedes that the hearsay report was admissible at the administrative hearing. *See Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (upholding admissibility of and reli-

ance by hearing examiner on physician's hearsay report despite lack of cross-examination of the physician, where claimant did not exercise his right to subpoena the physician); *Souch v. Califano*, 599 F.2d 577, 579–80 (4th Cir.1979) (same, citing *Richardson*). Hearsay alone may constitute "substantial evidence" supportive of a finding, but the finding of the ALJ should not rest solely on the hearsay testimony that does not have rational probative force. *Leitman v. McAusland*, 934 F.2d 46, 51 (4th Cir.1991).

Consistent with the above precedent, the Court finds that the ALJ properly considered the Van Ost report and was not required to afford it little or no weight simply because Dr. Van Ost did not testify. FCPS had the opportunity to subpoena Dr. Van Ost and to examine her at the due process hearing, but did not avail itself of that opportunity. Therefore, its argument that the ALJ should have given little or no weight to the report because Dr. Van Ost did not testify is without merit. *Richardson*, 402 U.S. at 402, 91 S.Ct. 1420.

■ FCPS alternatively argues that Dr. Van Ost's report should have been excluded from the administrative hearing because it was never disclosed to the IEP team. FCPS argues that the Parents failed to cooperate in good faith with the school authorities to develop the IEP. *See S.M. v. Weast*, 240 F.Supp.2d 426, 436 (D.Md.2003) (holding that a "critical prerequisite" for tuition reimbursement under the IDEA is good faith cooperation by the parents with school authorities in developing an IEP). While *Weast* did require that parents cooperate in good faith with school officials to develop an IEP, there is no evidence that the Parents acted in bad faith. *Id.* The Parents produced Dr. Van Ost's report immediately following their receipt of the report, and fully two weeks in advance of the administrative hearing. This two week notice clearly satisfies the five-day notice requirement imposed by 20 U.S.C. § 1415(f)(2)(A). The parties were unable to schedule an IEP Team meeting to discuss the report prior to the date reserved for the due process hearing. The Court accordingly finds that the Parents did not act in bad faith or fail to cooperate with FCPS in developing and reviewing IS' 2002–03 IEP.

**E. *Appropriateness of IS' Placement at the Ivymount School***

■ The ALJ's conclusion that "the proper, least restrictive placement under the continuum of placements contemplated by [the] IDEA, is a nonpublic educational program[,]" Decision at 41, is supported by evidence in the record. Stephanie de Sibour testified that an appropriate placement was available for IS at the Ivymount School, which is an all special education school. Tr. 310, 312. The program is a combination of academic times during the day, usually in the morning and the afternoon, and related pull-out services, including computer lab, music and art therapy, recreation, and community trips. Tr. 306. In contrast to the services offered under the 2002–03 IEP, Ms. de Sibour recommended individual occupational and physical therapy and assistive technology support services, rather than a consult. Tr. 305–06. She testified that the proposed classroom, with eight other students, would provide IS with verbal peers to help her language development. Tr. 306. No assistant would be provided, because of the classroom staffing, with three to five adults present at any one time. Tr. 307–08.

FCPS does not contest that Ivymount could meet IS' needs. Rather, it argues that the ALJ erroneously held it to a heightened standard by ordering it to fund IS' placement in an optimal program. FCPS contends that Judge Jacobson relied

on the Van Ost report and the Mother's positions that IS would be "better off" in a separate special education class. *See* Finding of Fact 39; Bd. Ex. 61 at 4. As FCPS correctly notes, the IDEA's FAPE standards do not require schools to provide an education that will enable the child to achieve maximal educational benefit. *MM v. School Dist. of Greenville County,* 303 F.3d at 535 (citing *Rowley,* 458 U.S. at 192, 102 S.Ct. 3034). "The requirement is satisfied when the state provides the disabled child with 'personalized instruction with sufficient support services to permit the child to benefit educationally from the instruction.'" *A.B. v. Lawson,* 354 F.3d 315, 330 (4th Cir.2004) (quoting *Rowley,* 458 U.S. at 203, 102 S.Ct. 3034). Setting aside the Van Ost report and the testimony of the Mother, the record in this case shows that FCPS's proposed 2002–03 IEP, with placement in the regular, second grade classroom at NFES, failed to offer IS a FAPE. Far from being an "optimal" placement for IS, the Court finds that placement at Ivymount is the least restrictive environment where IS could receive meaningful educational benefit.

### Conclusion

On balance, the Court finds that the factual findings and conclusions of the ALJ are supported by substantial evidence in the record submitted at the due process hearing. For the foregoing reasons, the ALJ's Decision will be affirmed. FCPS's Motion for Summary Judgment will be denied, and the Parents' Cross–Motion for Summary Judgment will be granted. An appropriate order follows.

### *ORDER*

The Court having considered Plaintiff's Motion for Summary Judgment and Defendants' Amended Cross–Motion for Summary Judgment and the record in this case, and for the reasons stated in the accompanying Memorandum Opinion, it is this sixth day of May, 2004

ORDERED, that Defendants' Cross–Motion for Summary Judgment is GRANTED;

ORDERED, that Plaintiff's Motion for Summary Judgment is DENIED; and

FURTHER ORDERED, that the Clerk of Court transmit copies of this Order and the Memorandum Opinion to counsel for the parties.