**Daniel WAGNER, et al., Plaintiffs,**

**v.**

**Charles L. SHORT, et al., Defendants.**

**No. CIV. L–98–2282.**

United States District Court,
D. Maryland.

Aug. 3, 1999.

---

Matthew B. Bogin, Michael J. Eig, Holly Lynn Parker, Washington, DC, for plaintiffs.

Charles W. Thompson, Jr., County Attorney, Sharon V. Burrell, Anne T. Windle, Assistant County Attorneys, Rockville, MD, for defendants Montgomery County Department of Health and Human Services and Douglas M. Duncan.

J. Joseph Curran, Jr., Attorney General, JoAnn G. Goedert, Assistant Attorney General, Baltimore, MD, for defendants Nancy S. Grasmick and Maryland State Department of Education.

## MEMORANDUM

LEGG, District Judge.

Plaintiffs Daniel Wagner and his parents, Daniel and Regina Wagner, have brought this Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., action against the Montgomery County Department of Health and Human Services, the Maryland State Department of Education, and various state and county officials. The parties have filed cross-motions for summary judgment. For the reasons stated below, the plaintiffs' motion will be denied and the defendants' motions will be granted.

### I.

Plaintiff Daniel Wagner was born on January 19, 1996, and was diagnosed with autism by the Georgetown University Medical Center Child Development Clinic on October 30, 1997. Daniel is in need of special education and related services. On November 7, 1997, the Wagners contacted the Montgomery County Infants and Toddlers Program ("MCITP"), a division of the Montgomery County Department of Health and Human Services ("DHHS"), which provides early intervention services to children under three years of age. When the MCITP becomes aware of an infant or toddler with possible disabilities, it assigns a services coordinator who contacts the child's family to initiate a process to determine the child's needs and to create an Individualized Family Service Plan ("IFSP").

The MCITP assigned Susan Ferrara to act as services coordinator for plaintiffs.

Ferrara contacted the Wagners on December 2, 1997, and scheduled two home visits for December 4 and 10, 1997. The Wagners canceled the scheduled home visits on December 4, 1997, and they were rescheduled for December 19 and 23, 1997.

On December 19, 1997, Ferrara visited plaintiffs in their home, provided them with information about available services and procedures, and asked them to sign the release forms necessary for the MCITP to review privately completed medical evaluations of Daniel and to allow the MCITP to perform its own evaluation. During this initial visit, the Wagners told Ferrara that they wished to have Daniel enrolled in an intensive Applied Behavior Analysis ("ABA") program operated by Community Service for Autism Adults and Children ("CSAAC"), a private organization serving persons with disabilities. The Wagners did not execute the release forms.

On December 22, 1997, the Wagners canceled the home visit scheduled for the following day. On January 23, 1998, a second home visit took place, during which a draft IFSP was created. The Wagners requested a specific reference that the MCITP attempt to obtain funding for the CSAAC program. Although the Wagners' request was incorporated into the draft IFSP, the Wagners refused to sign the draft IFSP.

MCITP manager Joan Liversidge met with the Wagners on February 3, 1998 to discuss CSAAC placement for Daniel. Liversidge explained that the CSAAC was not an approved infants and toddlers provider since children usually do not participate in its programs until after they reach three years of age. Liversidge explained that the MCITP would have to work with Montgomery County Public Schools ("MCPS") to obtain early admission for Daniel. To that end, Liversidge asked the Wagners to execute the releases necessary to obtain Daniel's evaluations.

On February 17, 1998, the Wagners provided the MCITP with one of Daniel's five private evaluations. They continued to refuse to allow the MCITP to conduct an evaluation and assessment of Daniel. A week later, Liversidge met with MCPS staff to discuss Daniel's early entry into the CSAAC program. MCPS representatives expressed concern about the lack of information about Daniel's needs.

The Wagners filed a due process hearing request on February 27, 1998 and thereafter refused to cooperate with the MCITP. A hearing was held on April 7 and 15, 1998, before Administrative Law Judge ("ALJ") Eleanor A. Wilkinson. On May 28, 1998, ALJ Wilkinson found that the draft IFSP was reasonably calculated to provide Daniel with developmental benefit under the IDEA.

II.

The Court shall grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The summary judgment inquiry thus scrutinizes the [non-moving party's] case to determine whether the [non-moving party] has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1316 (4th Cir.1993); *accord Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In determining whether there exists a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See Overstreet v. Kentucky Cent. Life Ins. Co.,* 950 F.2d 931, 937–38 (4th Cir.1991).

The IDEA is divided into two major components. Part B of the Act governs

children from the ages of three through twenty, while Part C governs children under three years of age. Early intervention services under Part C are designed to meet the child's developmental needs, including special education and related services. 20 U.S.C. § 1432(4). Services must be provided in conformity with an IFSP. 20 U.S.C. § 1432(4)(H).

A child's IFSP is a written document developed by a multidisciplinary team, including the child's parents, which states the child's levels of development, the family's resources, priorities, and concerns, and the major outcomes expected to be achieved for the child and the family. 20 U.S.C. § 1436(d). The written consent of a child's parents is a prerequisite to the provision of early intervention services under Part C of the IDEA. 20 U.S.C. § 1436(e).

### A.

■ In Maryland, the DHHS, through the MCITP, administers Part C services, while MCPS administers Part B services. As of this date, Daniel's age renders him ineligible for Part C services; he is now entitled to Part B services. DHHS argues that because Daniel has "aged out" of Part C, plaintiffs' allegations that defendants failed to provide appropriate services under Part C are moot because even if plaintiffs establish a Part C violation, DHHS is no longer responsible for administering Daniel's IDEA services. Accordingly, even if this Court were to find an IDEA violation, an order requiring the MCITP to fund the CSAAC program would not be appropriate.

■ The IDEA empowers district courts to grant successful IDEA plaintiffs "such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). In *Burlington Sch. Comm. v. Massachusetts Dep't of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the Supreme Court held that courts' authority to grant appropriate relief under the Act includes the power to order school authorities to reimburse parents for private school expenditures when parents place a child in private school during a successful legal challenge to a proposed IEP. 471 U.S. at 369, 105 S.Ct. 1996. On the theory that Congress did not intend the IDEA to entitle disabled children to a free education only where a child's parents are able to pay for private placement during a legal challenge to proposed services, *Burlington* has been extended to allow district courts to grant compensatory educational services to remedy past deprivations caused by violations of the IDEA. *See Pihl v. Massachusetts Dep't of Educ.*, 9 F.3d 184, 188–90 (1st Cir.1993); *Hall v. Knott County Bd. of Educ.*, 941 F.2d 402, 407 (6th Cir.1991); *Lester H. v. Gilhool*, 916 F.2d 865, 872–73 (3d Cir.1990); *Jefferson County Bd. of Educ. v. Breen*, 853 F.2d 853, 857–58 (11th Cir.1988); *Miener v. Missouri*, 800 F.2d 749, 753–54 (8th Cir.1986). The nature of compensatory services can include tutoring, summer school, or other forms of extra assistance. *See Pihl*, 9 F.3d at 188 n. 8 (collecting cases).

Compensatory education has not been limited as a remedy to cases where the student remains within the age range for eligibility under the IDEA. *Id.* at 189–90; *Lester H.*, 916 F.2d at 873. In *Pihl*, a twenty-seven-year-old man filed a lawsuit alleging that he was denied educational services due him as a disabled child. The district court dismissed the action as moot because the plaintiff had passed the age of entitlement for services. The First Circuit reversed, finding that the IDEA empowers courts to grant compensatory education to plaintiffs who are beyond the statutory age of entitlement for special education services. 9 F.3d at 189–90. The court found that compensatory education must be available beyond the statutory age of entitlement to give meaning to a disabled student's right to an education. *Id.* at 189. "Otherwise, school districts simply could stop providing required services to older teenagers, relying on the Act's time-con-

suming review process to protect them from further obligations." *Id.*

The same rationale applies here. To give meaning to the state's obligations under Part C of the IDEA, compensatory education must be an available remedy for children who establish Part C violations but have since reached the age of three. Otherwise, the MCITP and similar agencies could abrogate their responsibilities under the IDEA and escape any accountability simply by relying on the time-consuming appeals process.

*Malkentzos v. DeBuono,* 102 F.3d 50 (2d Cir.1996), on which defendants heavily rely, is not to the contrary. There, the New York State Department of Health appealed a preliminary injunction entered by a district court requiring the state to provide forty hours of ABA services per week to a child under Part C of the IDEA. 102 F.3d at 54. During the course of the appeal, the child aged out of Part C. In New York, the State Department of Health is responsible for administering Part C services. The Second Circuit Court of Appeals found that the Health Department's appeal of the injunction was moot because the appellant was no longer responsible for providing the child's IDEA services.

Thus, there was no question of compensatory services in *Malkentzos* because the injunction ensured that the child received services all along. Here, on the other hand, plaintiffs' allegation is that Daniel has been deprived appropriate services under Part C. Accordingly, Daniel's complaint is not moot and 1 will proceed to address its merits.

### B.

■ The IDEA gives this Court jurisdiction to review the decision of a state ALJ. 20 U.S.C. § 1415(e)(2). The burden of proof rests on the plaintiffs, who are challenging the administrative decision. *See Barnett v. Fairfax County Sch. Bd.,* 927 F.2d 146, 152 (4th Cir.1991). The ALJ's findings of fact "are entitled to be considered prima facie correct." *Doyle v. Arlington County Sch. Bd.,* 953 F.2d 100, 103 (4th Cir.1991). In reviewing the ALJ's legal conclusions, the Court is "required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings." *Id.*

■ As an initial matter, the Court must determine whether the ALJ applied the appropriate legal standard in her decision. Judge Wilkinson found that the standard governing Part B cases, whether the services offered were reasonably calculated to enable the child to receive educational benefit, properly informs an analysis of a Part C claim. In the instant case, the ALJ decided the claim by determining whether the early intervention services offered "were reasonably calculated to provide [Daniel] with developmental benefit."

Plaintiffs contend that the ALJ applied an erroneous standard, that Part C services "are virtually unlimited," and that the Part B standard is irrelevant in Part C cases. Parts B and C are different in that Part B services focus on promoting "educational benefit," while Part C focus on meeting the developmental needs of disabled infants and toddlers and their families. Those differences aside, the basic structure and purpose of Parts B and C "are strikingly similar" and the standard for Part B cases provides much guidance in Part C cases. *See Still v. DeBuono,* 101 F.3d 888, 892 (2d Cir.1996). Accordingly, I find that the ALJ's analysis of early intervention services, using the standard of determining if they were reasonably calculated to provide Daniel with developmental benefit, was appropriate.

■ Plaintiffs argue that the ALJ erred in finding that the proposed early intervention services short of the CSAAC program were reasonably calculated to provide Daniel with developmental benefit. Judge Wilkinson noted that there is a great deal of debate within the child development and educational communities about

the appropriate services for autistic children and found that the MCITP was unable to determine the appropriateness of ABA services because of the paucity of information the Wagners made available about Daniel's needs.

The ALJ found that CSAAC, Ferrara and Liversidge all informed the Wagners that inclusion in the CSAAC program would require approval from MCPS and was unusual for a child just twenty-seven months old. To gain that approval, it was necessary for the parents to work with the MCITP staff. The Wagners failure to cooperate is the primary reason the IFSP was never finalized and MCPS had insufficient information to assess Daniel's need for the CSAAC program. Finally, the MCITP cannot be liable for failing to secure CSAAC funding. It would defy logic to fault the MCITP for failing to convince the MCPS to fund Daniel's involvement in the CSAAC program when the MCITP, because of the Wagners' unwillingness to share Daniel's evaluations, consent to a county evaluation or participate in the development of the IFSP, was unable to establish that Daniel's developmental needs warranted early participation in the program.

For the aforementioned reasons, defendants' motions for summary judgment will be GRANTED by separate Order.

### ORDER

For the reasons stated in the accompanying memorandum, it is on this 3RD day of August, 1999,

ORDERED that,

1. Plaintiffs' motion for summary judgment is denied;

2. Defendants Charles L. Short, Montgomery County Department of Health and Human Services, and Douglas M. Duncan's motion for summary judgment is granted;

3. Defendants Nancy S. Grasmick and the Maryland State Department of Education's motion for summary judgment is granted; and

4. Judgment is entered in favor of defendants against plaintiffs.