Daniel G. WAGNER, Jr., et al.

v.

**BOARD OF EDUCATION OF MONTGOMERY COUNTY, Maryland, et al.**

Nos. CIV.A.DKC 2002–0763, CIV.A.2003–0255.

United States District Court, D. Maryland.

Sept. 29, 2004.

Kerry Lynn Edwards, Attorney At Law, Arlington, VA, Sharon Krevor Weisbaum, Brown Goldstein and Levy LLP, Baltimore, MD, for Plaintiffs.

Jeffrey A. Krew, Attorney at Law, Ellicott City, MD, Roger W. Titus, Venable Baetjer and Howard, Rockville, MD, for Defendants/ThirdParty Plaintiff.

Wayne Darryl Steedman, Callegary and Steedman PA, Baltimore, MD, for Movant/ThirdParty Defendant.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in these related Individuals with Disabilities Education Act ("IDEA") cases are (1) the motion of Plaintiffs Daniel G. Wagner, Jr., Regina Wagner, and Daniel Wagner, Sr., renewing their request for injunctive relief pursuant to 20 U.S.C. § 1415(i)(2)(B)(iii); (2) Plaintiffs' motion for contempt and other relief, pursuant to 18 U.S.C. § 401 and Fed.R.Civ.P. 70; (3) Plaintiffs' motion for summary judgment, pursuant to Fed.R.Civ.P. 56; and (4) the cross-motion of Defendants Board of Education of Montgomery County and Jerry D. Weast for summary judgment, also pursuant to Fed.R.Civ.P. 56. The issues are briefed and the court has reviewed the administrative record. The court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the court denies Plaintiffs' motions for preliminary injunctive relief, contempt, and summary judgment, and grants Defendants' cross-motion for summary judgment.

## I. The Individuals with Disabilities Education Act

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and accompanying regulations, 34 C.F.R. § 300 et seq., require all states that receive federal funds for education to provide each child between the ages of three and twenty-one, who has a disability, with a free, appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A).

Maryland's regulations governing the provision of a FAPE to children with disabilities in accordance with the IDEA are found at Md. Regs.Code tit. 13A, § 05.01. A student with autism who is between three and twenty-one years of age is considered a student with a disability and is covered by Maryland's implementation of the IDEA. § 05.01.03(B)(70)(a).

The FAPE guaranteed by the IDEA must provide a disabled child with meaningful access to the educational process. *See Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 192, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The FAPE must be reasonably calculated to confer "some educational benefit" on the disabled child. *Id.* at 207, 102 S.Ct. 3034. The benefit must also be provided in the least restrictive environment ("LRE") appropriate to the child's needs, with the disabled child participating to the "maximum extent appropriate" in the same activities as his or her non-disabled peers. 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.550. The IDEA does not require that a school district provide a disabled child with the best possible education, *Rowley,* 458 U.S. at 192, 102 S.Ct. 3034, or that the education maximize each child's potential, *see Hartmann v. Loudoun County Bd. of Educ.,* 118 F.3d 996, 1001 (4th Cir.1997). The benefit conferred, however, must amount to more than trivial progress. *See Reusch v. Fountain,* 872 F.Supp. 1421, 1425 (D.Md. 1994) (*Rowley's* " 'some educational benefit' prong will not be met by the provision of de minimis, trivial learning opportunities.") (citing *Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 635 (4th Cir.1985)).

To assure delivery of a FAPE, the IDEA requires a school district to provide an appropriate Individualized Education Program ("IEP") for each child determined to be learning disabled. 20 U.S.C. § 1414(d). That IEP is formulated by a team ("IEP Team") consisting of the parents or guardian of the child, a representative of the school district, the child's regular and special education teachers, an individual who can interpret results of evaluations of the child, and, when appropriate, the child himself. 20 U.S.C. § 1414(d)(1)(B); Md. Regs.Code tit. 13A, § 05.01.07(A). The IEP must state the student's current educational status, annual goals for the student's education, which special educational services and other aids will be provided to the child to meet those goals, and the extent to which the child will be "mainstreamed," i.e., spend time in regular school environments with non-disabled students. 20 U.S.C. § 1414(d)(1)(A).

The IDEA provides a series of procedural safeguards "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to those decisions." *MM ex rel. DM v. Sch. Dist. of Greenville County,* 303 F.3d 523, 527 (4th Cir.2002) (internal quotation marks and citation omitted); *see also* 20 U.S.C. § 1415. Among those safeguards, a parent must be provided prior written notice of a decision to propose or change the educational placement of a student. Md. Regs.Code tit. 13A, § 05.01.13(B). A parent may also request a meeting at any time to review and, as appropriate, revise the student's IEP. Md. Regs.Code tit. 13A, § 05.01.08(B)(3).

If the parents are not satisfied with the IEP, they may "present complaints with respect to any matter related to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6). After such a complaint has been received, the parents also are entitled to request a due process hearing conducted by the state or local educational agency. 20 U.S.C. § 1415(f). In Maryland, the Ma-

ryland Office of Administrative Hearings conducts the due process hearing. Md. Code Ann., Educ. § 8–413; Md. Regs. Code tit. 13A, § 05.01.15(C)(1). Any party can then appeal the administrative ruling to federal or state court. Md.Code Ann., Educ. § 8–413(h).

Recognizing that the IDEA's substantial procedural protections could often take a significant amount of time in which to run their course, Congress also saw fit to include in the IDEA a provision dealing directly with the child's placement during the pendency of any proceedings challenging a proposed IEP. *Wagner v. Bd. of Educ. of Montgomery County,* 335 F.3d 297, 300 (4th Cir.2003). The "stay put" provision requires that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child . . . ." 20 U.S.C. § 1415(j).

■ When a FAPE is not provided to a disabled student, the student's parent may place the child in a private school and then seek tuition reimbursement from the state. *See Sch. Comm. of Burlington v. Dep't of Ed.,* 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The parent will recover if (1) the placement proposed by the state was inadequate to offer the child a FAPE, and (2) the private education services obtained by the parents were appropriate to the child's needs. *Id.* at 370, 105 S.Ct. 1996.

## II. Background

This memorandum opinion and accompanying Order resolve motions in two related cases, *Wagner v. Bd. of Educ. of Montgomery County,* DKC–02–CV–763 ("Wagner I"), and *Wagner v. Bd. of Educ. of Montgomery County,* DKC–03–CV–255 ("Wagner II").

Plaintiff Daniel Wagner, born in January 1996, is autistic. In August 1999, he began receiving educational services from Community Services for Autistic Adults and Children ("CSAAC"), a private agency that provides a home based special education program for autistic children.[1] The services provided to Daniel were modeled on the Lovaas method, a discrete trial instruction, applied behavioral approach to teaching children with autism. The services were funded by the Montgomery County Public School System ("MCPS") in accordance with the IDEA. MCPS is governed by Defendant Montgomery County Board of Education. Defendant Jerry Weast is superintendent of MCPS.

On March 8, 2001, Daniel's IEP Team developed an IEP ("March IEP") that recommended that he continue in the CSAAC program for the school year July 2, 2001 through June 30, 2002. This was the last IEP upon which all parties agreed. As stated by the Fourth Circuit in *Wagner*:

> Problems arose by October or November of 2001, when the relationship between the Wagners and some of the personnel at CSAAC deteriorated. On November 14, 2001, CSAAC ceased sending its employees to the Wagner home, effectively cutting off the provision of services. On November 28, 2001, when it became apparent that CSAAC would not perform as obligated, the School Board prepared and proposed a new IEP for Daniel. The new IEP contemplated provision of services at Maryvale Elementary School (a MCPS school). By January of 2002, the Wagners rejected the new IEP and initiated due process proceedings.

---

**1.** For a history of Plaintiffs' earlier attempts to obtain services prior to Daniel's third birth-

day, *see Wagner v. Short,* 63 F.Supp.2d 672 (D.Md.1999).

On February 14, 2002, the ALJ conducted a hearing to consider the proposed change in placement for the remainder of the school year. At the hearing, counsel for CSAAC stated that CSAAC was willing to provide services to Daniel in order to satisfy the "stay put" provision of the IDEA. The very next day, however, the offer was withdrawn. In a letter dated March 6, 2002, the School Board then offered the Wagners the "Maryvale Plus" plan, which consisted of the aforementioned new IEP proposal augmented with more one-on-one discrete trial/systematic instruction (to reach a full 20 hours/week) at Maryvale and 10 hours in regular kindergarten at Maryvale, with an instructional assistant.

335 F.3d at 299.

The Wagners rejected the "Maryvale Plus" plan, and, on March 12, 2002, came to this court seeking a preliminary injunction to effect their "stay put" rights under the IDEA. On April 5, 2002, this court conducted a hearing and later issued an opinion in which it concluded that "Daniel's then-current educational placement, provided by CSAAC, has been and, as I find, is no longer available." *Wagner v. Bd. of Educ. of Montgomery County,* 198 F.Supp.2d 671, 675–76 (D.Md.2002). The then-current placement was unavailable because only a Lovaas program would satisfy the requirements of the March IEP, CSAAC was the only state-approved provider of Lovaas services, and CSAAC was not available to provide services. This court ordered Defendants to propose another at-home alternative for a "stay put" placement not involving CSAAC. *Id.* at 678.

On July 31, 2003, the Fourth Circuit vacated this court's order and remanded for further proceedings, finding error in the district court's conclusion that, upon a finding of unavailability, it should, pursuant to section 1415(j), seek out alternative placements by ordering the School Board to propose such.... When presented with an application for a "stay put" injunction, the district court should have entered an order maintaining the child in the then-current education placement, whatever the status of that placement.

335 F.3d at 301, 303.

In vacating and remanding, the Fourth Circuit recognized that a request for "stay put" can become moot:

The Board argues that the Wagners' request for "stay put" relief has been rendered moot by their unilateral placement of Daniel in the Autistic Learning Center (ALC). It appears, however, that the Wagners were not successful in their attempt to enroll Daniel in ALC, so their "stay put" request still presents a live controversy.

335 F.3d at 303 n. *. By the time the parties presented the issue again to this court, the issue of "stay put" indeed had become moot, at least as it related to prospective relief: Before the 2003—2004 school year, Mrs. Wagner moved out of Maryland with her four children, three of whom were apparently enrolled in school elsewhere.[2] When the court attempted to schedule a further hearing on both the injunction and contempt motions, disputes about the necessity for depositions arose and the court learned of issues regarding representation and the limited availability of counsel. Because of the Plaintiffs' move out of state, counsel advised orally that

---

**2.** *See* Wagner I, paper no. 86, decl. of R. Wagner, at ¶ 42; *id.,* decl. of D. Wagner, at ¶ 51; Wagner I, paper no. 90, at ¶ 1.

there was no longer any urgency in resolving the pending issues. No further hearing has been held.

Upon review of the papers, and given the changed circumstances of the Wagners, the court will first resolve the merits of the administrative appeal concerning the adequacy of the November 28, 2001 IEP ("November IEP"). Because the court will uphold the November IEP, and grant the Board's cross motion for summary judgment, any additional prospective issues raised in the renewed injunction motion are moot both because of the move of the Wagners out of Maryland and due to the unlikelihood of success on the merits. The court declines to issue an injunction, essentially *nunc pro tunc,* and thus denies the motion for preliminary injunction. Finally, the vacating of the court's orders precludes a finding of civil contempt. Any financial issues concerning requests for reimbursement by the County will only arise if the County makes such a demand on Plaintiffs.

## III. Administrative Appeal

What follows is a fuller description of the events leading to the decision by the ALJ as well as the necessary facts from the administrative record.

By the fall of 2001, CSAAC and the Wagners were unhappy with each other. In September the Wagners voiced concerns that CSAAC's services for Daniel were deteriorating. On October 3, 2001, Dr. Kristin Villone and Dr. Larissa Reynolds, psychologists for CSAAC, wrote a letter to Eileen Fazio, a placement specialist for MCPS, listing numerous, serious criticisms they had concerning the Wagners' involvement in Daniel's home based educational program. The Wagners did not receive a copy of, and were not made aware of, this letter or its contents.

On November 12, the Wagners informed CSAAC that they had installed a video camera in Daniel's therapy room at their home, and intended to videotape Daniel's therapy sessions. On November 13, in response, CSAAC discontinued services to Daniel. On November 14, the Wagners informed Ms. Fazio of CSAAC's actions. The Wagners offered to remove the video camera, but CSAAC did not resume services.

On November 28, Daniel's IEP Team met and a new IEP was proposed. That proposal recommended placement in "CAPPS," a non-Lovaas, school based program at Maryvale Elementary School. The Wagners disagreed with that recommendation. In December 2001 and January 2002 the Wagners requested another IEP meeting to review and revise Daniel's IEP. MCPS refused to grant another meeting.

On January 18, 2002, the Wagners filed a request for a due process hearing, demanding that MCPS either restore CSAAC's services or provide an alternative conforming to the specifications of the CSAAC program, i.e., another Lovaas home based program.

CSAAC's services were never restored. Between November 14, 2001 and June 20, 2002, Daniel received some Lovaas instruction paid for by the Wagners, but received no MCPS-funded services. Shortly after June 20, 2002, pursuant to an Order of this court, *see* supra at 608, Daniel began receiving MCPS-funded services from New Jersey Life, another Lovaas home based program for autistic children.

The due process hearing began in February and did not end until October of 2002. On December 2, 2002, Administrative Law Judge D. Harrison Pratt ("ALJ") denied the Wagners' appeal. December 2, 2002 Decision and Order of Administrative Law Judge D. Harrison Pratt, MSDE–MONT–OT–200200022 ("ALJ's Decision"). The Wagners, having exhausted their ad-

ministrative remedies, appealed to this court. *See* Wagner II, paper no. 1. Here, the Wagners seek a declaration that Daniel has been denied a FAPE in the LRE, reimbursement for out-of-pocket expenses incurred for Daniel's education since November 2001, costs and attorney's fees, and such other relief as this court deems proper. Defendants, in their cross-motion for summary judgment, seek dismissal of the complaint, with prejudice.

If nothing else, this case serves as a reminder that no law or set of regulations can anticipate and provide for all eventualities. Particularly in this difficult area of education for a disabled child, it takes a firm resolve, by parents and educators alike, to work collaboratively, in pursuit of a child's education, even when that collaboration is challenging, choices are limited, and patience runs thin. The IDEA does not provide an easy solution when services precipitously become unavailable. Perhaps, if there had been more open, trusting communication, the Wagners might have been able to allay or mitigate the CSAAC staff's concerns about their ability to provide the required therapy hours at home, or at least better understood the choices before them in November. CSAAC might have been less suspicious of the Wagners' decision to videotape Daniel's sessions; the Wagners might not have felt the need to install a camera at all; CSAAC might have been more willing to return to Daniel after their initial recoil. MCPS might have been more willing to hold the IEP meeting the Wagners requested in December and to engage in additional conversation about the merits of Maryvale versus Lovaas, and the Wagners might have been more receptive to such a conversation, and to the possibility that Maryvale was, in fact, an appropriate, if not their preferred, placement. Instead, perceived lack of candor, miscommunication, and mistrust exacerbated a disabled child's already difficult struggle to learn.

Resolution of the motions before the court today will not change that reality.

## IV. Motions for Summary Judgment

### A. Standard of Review

In *MM v. Sch. Dist. of Greenville County,* 303 F.3d 523 (4th Cir.2002), the Fourth Circuit stated the standard of review for motions for summary judgment in IDEA cases:

> In a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified *de novo* review, giving "due weight" to the underlying administrative proceedings. In such a situation, findings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute [its] own notions of sound educational policy for those of local school authorities ....

303 F.3d at 530–31 (citations omitted). General standards of review for summary judgment motions also apply in IDEA cases, as illustrated in *Bd. of Educ. of Frederick Cty. v. I.S.,* 325 F.Supp.2d 565 (D.Md.2004):

> In addition, the Court's analysis is shaped by the mandate of Rule 56(c) of the Federal Rules of Civil Procedure that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "When the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *White v. Rockingham Radiologists, Ltd.,*

820 F.2d 98, 101 (4th Cir.1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(e)). The Court's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant resolution of the matter at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where, as here, cross-motions for summary judgment are filed, a court must "evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987).

325 F.Supp.2d at 578.

■■■■ Plaintiffs in IDEA cases face an uphill battle for several reasons. First, just as Plaintiffs were required to carry the burden of proof in the administrative hearing, *Weast v. Schaffer ex rel. Schaffer*, 377 F.3d 449, 456 (4th Cir.2004) (holding that "parents who challenge an IEP have the burden of proof in the administrative hearing"), Plaintiffs must also carry that burden in this court, *I.S.*, 325 F.Supp.2d at 577 ("As the party challenging the administrative findings, Plaintiffs bear the burden of proof of establishing a violation of the IDEA.") (citing *Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 152 (4th Cir.1991), *cert. denied*, 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991); *Cavanagh v. Grasmick*, 75 F.Supp.2d 446, 457 (D.Md.1999)). Second, "[i]f the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct."

*Cavanagh*, 75 F.Supp.2d at 457 (citing *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir.1991)). Moreover, in according "due weight" to the findings of the ALJ, this court owes deference to the ALJ's determinations of the credibility of witnesses. "[T]he fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility." *Justin G. v. Bd. of Educ.*, 148 F.Supp.2d 576, 588 (D.Md.2001) (quoting *Bd. of Educ. of Montgomery County v. Hunter ex rel. Hunter*, 84 F.Supp.2d 702, 706 (D.Md. 2000)); *see Doyle*, 953 F.2d at 104. Lastly, as Defendants note, this court owes generous deference (as did the ALJ) to the educators on Daniel's IEP Team:

> We have always been, and we should continue to be, reluctant to second-guess professional educators. As we observed in *Tice v. Botetourt County School Board*, 908 F.2d 1200, 1207 (4th Cir. 1990), "once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals." Indeed, we should not "disturb an IEP simply because we disagree with its content," and we are obliged to "defer to educators' decisions as long as an IEP provided the child the basic floor of opportunity that access to special education and related services provides." *Id.* (internal citation and quotations omitted).

*MM*, 303 F.3d at 532–33.

**B. Analysis**

■■■■ In inquiries to determine whether a disabled student is being provided a FAPE under the IDEA, courts follow a two-step approach articulated in *Rowley*. As explained in *I.S.*,

> the Court must follow the two-step [*Rowley*] inquiry .... First, the Court must determine whether the state or local educational authority complied with

the procedures set forth in the Act. Second, the Court must determine whether the IEP was reasonably calculated to enable the child to receive educational benefits.

325 F.Supp.2d at 578 (citing *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034).

Properly applying the two-step *Rowley* inquiry, two questions were before the ALJ: (1) whether MCPS complied with the procedures set forth in the IDEA relating to development of the November IEP, and (2) whether MCPS, through the November IEP, offered Daniel a FAPE for the 2001–2002 school year.

In denying the Wagners' appeal, Judge Pratt stated:

> I conclude, as a matter of law, that the MCPS did not comply with the procedural requirements of the IDEA but that there was no loss of educational opportunity as the result of this failure to comply. [*Gadsby*]. I further conclude that the MCPS, through the IEP of November 28, 2001, offered FAPE and that that IEP was reasonably calculated to provide the student with meaningful educational benefit.

ALJ's Decision at 37.[3]

Plaintiffs now request that this court overturn the ALJ's ruling, arguing principally that (1) Daniel did, in fact, suffer "loss of educational opportunity as the result of" the IEP Team's failure to comply with the procedural requirements of the IDEA; (2) the November IEP's recommended placement at Maryvale did not offer a FAPE; and (3) the November IEP was not "reasonably calculated to provide the student with meaningful educational benefit.'" Wagner II, paper no. 20, at 1.

As will be explained, Plaintiffs' second and third arguments are unpersuasive, and the court will affirm the ALJ's determina-

tions that the Maryvale placement constituted a FAPE, reasonably calculated to provide Daniel with meaningful educational benefit. Plaintiffs' first argument is moot because actual interference with provision of a FAPE, and not merely loss of (any) educational opportunity, is the threshold question in this case; and in any event, because a FAPE was available to Daniel in the form of the Maryvale placement, to the extent that Daniel lost educational opportunity, it was the failure of the "stay put" mechanism during the pendency of the administrative due process hearing, and not any violation of procedural safeguards, that caused such loss.

Defendants, in their reply and cross-motion for summary judgment, challenge the ALJ's conclusion that MCPS violated the procedural requirements of the IDEA. *See* Wagner II, paper no. 24, at 29–32. Because the court finds that actual interference with the provision of a FAPE did not occur, and because actual interference is a prerequisite to Plaintiffs' requested relief, the court need not address whether MCPS complied with the procedural requirements of the IDEA.

**1. Whether the November IEP Was Reasonably Calculated To Provide Meaningful Educational Benefit To Daniel**

■ The ALJ concluded that the November IEP was reasonably calculated to provide Daniel with meaningful educational benefit. As explained *supra* at 610, the burden is on Plaintiffs to show otherwise.

Plaintiffs argue that the proposed Maryvale placement was not a FAPE calculated to provide Daniel with meaningful educational benefit because the November

---

**3.** The ALJ's last conclusion is somewhat redundant, as an education not calculated to provide meaningful educational benefit is, by the terms of the *Rowley* test, not a FAPE.

IEP did not adequately assess Daniel's needs, and therefore failed to provide an individualized program appropriate to Daniel's unique needs. *See* Wagner II, paper no. 20, at 27–36.

The goals contained in an IEP are the standard against which any proposed placement is measured. *See supra* at 606; *see also* Md. Regs.Code tit. 13A, § 05.01.06(E)(3)(c), 05.01.08(B)(1)(a).

It is undisputed that the goals and objectives for Daniel's development as stated in the November IEP were a "cut and paste" of the goals and objectives contained in the March IEP. ALJ's Decision at 29–30. Plaintiffs contend that the November IEP was and is invalid because the IEP Team did not engage in a thorough reassessment of Daniel's status, needs, and goals at the November meeting. *See* Wagner II, paper no. 20, at 27–36. Because Daniel's needs were not reassessed, Plaintiffs argue that the Maryvale placement could not possibly have been tailored to Daniel's supposedly unassessed needs, and therefore cannot have been calculated to provide meaningful educational benefit to him.

This argument is unpersuasive. First, the goals and objectives contained in the November IEP meeting were agreed upon by all parties. The Wagners raised no objection at the meeting to reusing the goals and objectives of the March IEP. ALJ's Decision at 29. The Wagners, in fact, were eager to win back the services of CSAAC—the placement recommended by the March IEP based on the goals in that IEP—or, alternatively, to find for Daniel as similar a placement as possible. Even accepting as true the Wagners' assertion that they thought the meeting was convened only to determine an interim place-

ment for Daniel, they had and expressed no interest in modifying Daniel's goals.

Second, even if the November IEP were invalid, the court would instead be assessing today whether the Maryvale placement could have been calculated to provide meaningful educational benefit as measured against the goals of the last IEP upon which all parties agreed—namely, the March IEP, which was by its own terms the guiding document for Daniel's 2001–2002 school year, and the goals of which are identical to those contained in the November IEP.[4]

The court therefore finds that the goals set forth for Daniel in the November IEP provided an individualized program for Daniel, and could therefore be used to determine whether the Maryvale placement was reasonably calculated to provide Daniel with meaningful educational benefit.

**2. Whether the Maryvale Placement Constituted a FAPE**

The ALJ concluded that the Maryvale Plan constituted a FAPE. Again, the burden is on Plaintiffs to show otherwise. *See supra* at 610.

Plaintiffs contend that the proposed Maryvale placement was not a FAPE because, for a variety of reasons, it was not suited to Daniel's needs. *See* Wagner II, paper no. 20, at 56–65. That assertion of fact was repudiated by the ALJ on the basis of witness testimony at the hearings. The ALJ weighed testimony for and against that assertion, and found most credible Kristin Secan, the Instructional Specialist Coordinator for Elementary Students with Autism for MCPS, and Lisa Grant, Technical Support Teacher

---

4. The IEP Team was under no obligation to make any revisions to the IEP until March of 2002, as the Team is required to review and, if appropriate, revise the IEP only annually. Md. Regs.Code tit. 13A, § 05.01.08(B)(1).

for MCPS's autism program, both of whom testified favorably about the Maryvale placement for Daniel. Less credible, in the ALJ's view, were Plaintiffs' two witnesses opposing the Maryvale placement, Dr. Charles Gordon, III, the child psychiatrist who first diagnosed Daniel with autism and had been involved in his treatment since that time, and Leslie Trautman, the educational therapist for Daniel's sister Grace, who is also autistic.

"If the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct." *Cavanagh,* 75 F.Supp.2d at 457. Plaintiffs have shown neither that the ALJ's findings were made in an irregular manner nor that they lack evidentiary support. Instead, Plaintiffs argue the merits of the testimony of various witnesses. Those arguments are unpersuasive.

First, Plaintiffs contend that the testimony of Ms. Secan and Ms. Grant were valueless because "[n]either Ms. Secan nor Ms. Grant know Daniel," and because Ms. Secan's "perspective is based solely on the documentation in the file." Wagner II, paper no. 20, at 59 & n.43.[5] The ALJ, however, preempted these objections squarely, stating that "Ms. Grant and Ms. Secan gave a much more detailed explanation of the CAPPS program and in particular *how [Daniel's] IEP of November 2001 could and would have been successfully implemented.* Ms. Grant and Ms. Secan gave considerable detail *as to how Daniel's specified needs would have been met.*" ALJ's decision at 36 (italics added).

By contrast, while Plaintiffs go to great lengths to convince the court of the credibility of the testimony of Dr. Gordon and Ms. Trautman, the ALJ concluded that neither Dr. Gordon nor Ms. Trautman convincingly addressed the question whether the Maryvale placement would provide a FAPE for Daniel. Plaintiffs argue that "Dr. Gordon testified that the Maryvale placement would be affirmatively harmful to Daniel, that the environment was inappropriate to meet Daniel's unique needs and would interfere with his learning." Wagner II, paper no. 20, at 64. While it is true that Dr. Gordon testified as such, *see* Tr. at 274, the ALJ concluded that Dr. Gordon was simply a less credible witness than Ms. Secan and Ms. Grant:

> Dr. Gordon's experience with implementation of in home Lovaas program [sic] is at best limited. . . . Furthermore, [he] testified that he had doubts as to whether the Parents could actually provide [the required] 10 hours of therapy.

> Additionally, I note that Dr. Gordon was not aware of the allegations made against the Parents by the staff at CSAAC. . . . As such he was taking at face value what the Parents had told him concerning the CSAAC program.

ALJ's Decision at 34. It is also noteworthy that Dr. Gordon admitted he had never seen Maryvale, *see* Tr. at 306, nor had he spoken to anyone there about Daniel, *see id.,* nor was he familiar with the methods used at Maryvale to address the concerns he voiced regarding Daniel's propensity to adopt maladaptive behaviors, *see id.* at

---

**5.** Plaintiffs' implication is that direct, ongoing exposure to the child is necessary in order credibly to evaluate the student's needs. Discrete trial programs, however, are meant to be evaluated from afar. Discrete trial instructors are typically college-age and receive only minimal training. Copious notes are taken by those instructors (as readers of the record of this case can attest) and are then passed to the professionals who run the programs. Those professionals track student progress largely on the basis of those notes. *See* Hearing Transcript ("Tr.") at 1282–83 (instructors typically college-age and paid ten dollars per hour); Tr. at 2259–60 (data collection "critical" to program implementation).

334, nor had he ever read the November IEP, *see id.* at 336.

Plaintiffs offer Ms. Trautman's testimony to show that "interaction with other autistic children in the autism classroom setting could cause Daniel to mimic the maladaptive behaviors of them and 'you might actually see a regression' and so the interaction ... '[m]ost certainly' could prove detrimental to Daniel's development." Wagner II, paper no. 20, at 65. Ms. Trautman's testimony, however, suffered two fatal flaws. First, the ALJ simply determined that

> Ms. Trautman's testimony is considerably less persuasive than the testimony of Ms. Secan and Ms. Grant. For the most part, Ms. Trautman was working with Grace. Her involvement with Daniel was more through observations than direct therapy or programming. Her opinions as to the program and staff at Maryvale were based upon one visit and her interactions with the Parents.

ALJ's Decision at 36. Second, while "Ms. Trautman's opinion was that the *best* program for Daniel would have been a home based, discreet [sic] trial, Lovaas type program," "[s]he was not asked whether the CAPPS program would have afforded Daniel any educational benefit." *Id.* (italics added). As noted *supra* at 2–3, the IDEA requires not that a school district provide a disabled child with the best possible education, but only that it provide some meaningful educational benefit.

In their reply brief, Plaintiffs also contend that the ALJ did not consider an array of factors they deem important, including the IEP Team's alleged lack of information about Daniel, the alleged lack of justification or basis for the change in placement, and the impact on the change in placement on Daniel. *See* Wagner II, paper no. 27, at 16. The ALJ's Decision, however, addressed each of these concerns. Judge Pratt clearly stated that he found Ms. Secan knowledgeable about Daniel, and that he trusted her judgment that the change in placement was appropriate, would constitute the least restrictive environment for Daniel, and would have a positive, not a negative, impact on Daniel:

> Ms. Secan has been involved with the educational planning for Daniel for a considerable period, having served as either his Special Educator and/or the Chair of his Central IEP meetings for 3 or 4 years prior to the IEP of November 2001. She was well versed in the documentation pertaining to Daniel's programs and performance. She was present at the November 2001 IEP Team meeting. I give considerable weight to Ms. Secan's opinion that the November 2001 IEP could have been successfully implemented in the CAPPS program at the Maryvale school. . . . She testified further that Daniel would have made meaningful educational progress at the Maryvale school. She testified as to Daniel's specific needs that would have been met at Maryvale . . . . She stated that Daniel would have opportunities for interaction with typical kindergarten students. She testified that Maryvale offered a good combination of participation in a typical school and the intensive behavioral supports called for in Daniel's IEP. She expressed her opinion that Daniel's generalization skills would be greatly enhanced in the Maryvale program. . . . Finally, Ms. Secan testified that the CAPPS program was the least restrictive environment in which the goals and objectives of the November 2001 IEP could be implemented.

ALJ's Decision at 30–32.

For these reasons, the court *affirms* the ALJ's conclusion that the Maryvale Plan constituted a FAPE.

3. **Whether Daniel Suffered Loss of Educational Opportunity and/or Denial of FAPE As the Result of Procedural Violations**

■ Plaintiffs argue that Defendants' alleged procedural violations caused Daniel to lose a host of educational opportunities and interfered with provision of a FAPE. *See* Wagner II, paper no. 20, at 36–54. Specifically, Plaintiffs contend that Daniel lost educational opportunity in the forms of: loss of CSAAC's services, loss of an appropriate transition, loss of an appropriate educational environment, reduction in the number and quality of one-on-one therapy hours, loss of appropriate mainstreaming, loss of adequate educational programming, loss of LRE, and loss of ESY. *See id.*

Even assuming Plaintiffs' allegations of procedural violations to be true, insofar as Plaintiffs contend Daniel lost educational opportunity, Plaintiffs' argument is moot. Whether Daniel lost some educational opportunity is not the question before the court. Rather, the threshold question is whether there was actual interference with Daniel's access to a FAPE. *DiBuo v. Bd. of Educ. of Worcester County*, 309 F.3d 184 (4th Cir.2002) (stating that "under our circuit precedent, a violation of a procedural requirement of the IDEA (or one of its implementing regulations) must actually interfere with the provision of a FAPE before the child and/or his parents would be entitled to reimbursement relief"); *Gadsby*, 109 F.3d at 956 ("[T]o the extent that the procedural violations did not actually interfere with the provision of a [FAPE], these violations are not sufficient to support a finding that an agency failed to provide a [FAPE]."); *accord Tice*, 908 F.2d at 1207 (relief denied where procedural violations had no impact on provision of FAPE). Loss of the services of a particular provider, of a particular educational environment, of a number and/or quality of

therapy hours, of a particular form of mainstreaming or educational programming, or of ESY may be regrettable, but the IDEA does not demand that any particular set or level of services be maintained for a student merely because they were previously provided to that student. Rather, the IDEA demands only that the services provided constitute "meaningful educational benefit." *See Rowley*, 458 U.S. at 192, 102 S.Ct. 3034.

Furthermore, and more simply, to the extent that Plaintiffs claim denial of a FAPE, because the court finds that the Maryvale placement constituted a FAPE, the procedural violations could not have, and did not, cause Daniel to lose access to that FAPE.

Plaintiffs also argue that after the November IEP, "Daniel's complete loss of educational services for several months . . . amounts to a denial of FAPE." Wagner II, paper no. 20, at 55. It is true that Daniel did not receive services after the November IEP, but it was not for lack of the availability of a FAPE that this was so, since the Maryvale placement—which was a FAPE—was available. Rather, it was the unavailability of the proper "stay put" placement, namely, the CSAAC service, which caused Daniel not to receive services at that time. Had CSAAC continued to provide services for the duration of the due process hearing as the "stay put" provision required, *see infra* at 28, or had the Wagners agreed to the Maryvale placement, services to Daniel would have continued.

Finally, Plaintiffs argue that the proposed "abrupt" mid-year transition into Maryvale amounted to a denial of a FAPE. *See* Wagner II, paper no. 20, at 55–56. The heart of Plaintiffs' argument is that "[a]ppropriate planning and preparation for such a move is necessary to ensure that the student succeeds in the new envi-

ronment." *Id.* at 56. While the ALJ did not address the transition issue by name, it is clear that he found the underlying concerns to have been addressed amply by Ms. Secan's testimony. *See* ALJ's Decision at 31 ("[Ms. Secan] testified further that Daniel would have made meaningful educational progress at the Maryvale school. She testified as to Daniel's specific needs that would have been met at Maryvale ....").

### 4. Whether MCPS Violated the Procedural Safeguards of the IDEA

Defendants contend that the ALJ erred in finding that the MCPS failed to comply with the procedural safeguards of the IDEA, *see* Wagner II, paper no. 24, at 29, in that Defendants were denied their parental rights in the development of the November IEP, *see* Wagner II, paper no. 20, at 5–27.

This question, however, is moot. As discussed *supra* at 614–15, the Fourth Circuit has made clear on numerous occasions that, to the extent that procedural violations do not actually interfere with the provision of a FAPE, these violations are not sufficient to support a finding that an agency failed to provide a FAPE. *DiBuo*, 309 F.3d at 190 (quoting *Gadsby*, 109 F.3d at 956); *accord Tice*, 908 F.2d at 1207; *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir.1990) ("the procedural faults committed by the Board in this case did not cause [the student] to lose any educational opportunity"). Because this court affirms the ALJ's finding that

the Maryvale plan constituted a FAPE, the violations, if any, could not have and did not result in actual interference with the provision of a FAPE for Daniel. Those violations, therefore, cannot subject Defendants to liability for reimbursement of Daniel's educational expenses under the IDEA. *See Gadsby*, 109 F.3d at 956. This court therefore declines to reach this question.

Because the court affirms the ALJ's finding that the Maryvale placement provided a FAPE, and because actual interference with that FAPE did not occur, Plaintiffs' motion for summary judgment is DENIED and Defendants' cross-motion for summary judgment is GRANTED.

## V. Motion for Preliminary Injunction

 When the case was remanded, Plaintiffs sought a preliminary injunction reinstating the prior order, which had been entered under this court's erroneous understanding of the "stay put" procedures. *See* Wagner I, paper no. 81. They did not seek the issuance of the "stay put" found to be appropriate by the appellate court. As made clear in their reply, Plaintiffs argue that, under the four factor test for issuing a preliminary injunction, this court would have then and should now issue a decision in their favor based on the situation at the time of the original ruling. *See* Wagner I, paper no. 87. They are concerned not with obtaining actual relief during the pendency of the administrative appeal, but a finding that might insulate them from having to reimburse the school system for costs incurred under the now abrogated "stay put" order.[6] *See id.* at 2.

---

**6.** Several courts have held that, while not entirely free from doubt, parents are not required to reimburse school systems for costs of maintaining "stay put" even when the parents do not prevail on the administrative appeal, thus making the "stay put" placement retroactively unnecessary. *See, e.g., Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 86 F.Supp.2d 354, 367–68 (S.D.N.Y.2000), *aff'd* 297 F.3d 195 (2nd Cir.2002); *T.B. v. Warwick*

*Sch. Dept.*, 2003 WL 22069432, *7 (D.R.I. 2003), *aff'd sub nom. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361 F.3d 80 (1st Cir. 2004). *But see Verhoeven v. Brunswick Sch. Comm.*, 207 F.3d 1, 6 n. 2 (1st Cir.1999). This court entered the now vacated "stay put" order. Plaintiffs did not unilaterally secure the placement. Whether they should have to reimburse the County for costs improperly imposed by this court is not now at issue.

In opposition, Defendants contend that the facts as they stand today, and not at the time of the original ruling, should be evaluated in determining whether Plaintiffs can satisfy the four-part test for issuing the injunction. Wagner I, paper no. 82, at 6. Defendants alternatively argue that, if the "stay put" placement be changed, it be changed to the "Maryvale Plus" placement offered earlier, not a CSAAC-equivalent placement as requested by Plaintiffs. *Id.* at 11.

In this case, whether the merits of the injunction are measured against the facts as they stood at the time of the original ruling or as they stand today is irrelevant. The court would not hold, on the record presented at the time, that Plaintiffs proved what the Fourth Circuit now says was necessary, nor can it so hold on the record as it stands today.

The Fourth Circuit cautioned:

District courts should, of course, be extremely cautious when considering whether to order a change in a child's placement under section 1415(i)(2)(B)(iii), given the statute's strong presumption, expressed in section 1415(j), in favor of the status quo and its provision for administrative hearing before adjudication in federal court.

With that understanding of section 1415(j), we return to the district court's decision. It is clear that the district court did not follow the proper procedures. When presented with an application for a "stay put" injunction, the district court should have entered an order maintaining the child in the then-current education placement, whatever the status of that placement. Although it is not at all clear that the Wagners made a showing sufficient to justify the grant of a preliminary injunction changing Daniel's placement, if the Wagners wanted a change, as it appears they did, they

should have requested such relief under section 1415(i)(2)(B)(iii).

*Wagner,* 335 F.3d at 302–03.

This court, then, should have entered a "stay put" order, directing Defendants to continue with the CSAAC based IEP. While the court earlier held that CSAAC could not be counted on to provide services or to follow through with its "offer" to resume services, CSAAC was not under an explicit court order to do so. If all parties understood that the "stay put" injunction was limited to the literal IEP, the coercive order, prohibiting the school system from changing the educational placement, might have been sufficient. The court, at least, would have allowed a trial period to see if "stay put" could effectively be implemented.

Even if that order were ineffective, the next step would have been to attempt to agree on a new placement. *See id.* at 302 ("where the then-current placement is functionally unavailable, . . . parties such as the Wagners are [not] without remedy. First, section 1415(j) allows the parties to effect a change in placement simply by agreeing upon the new placement."); 20 U.S.C. § 1415(j). The fact that such efforts failed prior to the parents' filing for "stay put" relief does not necessarily mean that they would have been unsuccessful had the parties understood the alternatives.

If such efforts failed, finally, then, Plaintiffs would have turned, as they do now, to section 1415(i)(2)(B)(iii) for "such relief as the court determines is appropriate." Plaintiffs would have had the much higher burden to show the justification for a preliminary injunction:

The difference between section 1415(j) and section 1415(i)(2)(B)(iii) is that any preliminary injunction entered under section 1415(i)(2)(B)(iii) is by no means automatic. The party seeking such an

injunction bears the burden of demonstrating entitlement to such relief under the standards generally governing requests for preliminary injunctive relief. *Wagner*, 335 F.3d at 302. At that stage, the court would have had to consider all contingencies, including the merits of the Maryvale proposal, to determine the matters of irreparable harm to Daniel if Plaintiffs' proposed placement were not implemented, as well as any harm to Defendants if Plaintiffs' proposal were adopted. The record at the time did not contain all of the necessary information to make those fact intensive determinations. Plaintiffs also would have had to show some measure of likelihood of success on the merits of their claim that the school board's proposal did not meet the FAPE test. As discussed above, the court finds that they have not, so whatever Plaintiffs' likelihood of success at the time, it could not have been sufficient to sustain their request for injunctive relief.

Neither can Plaintiffs satisfy their burden on the basis of the facts as they stand today, for the same reason: Plaintiffs cannot show likelihood of success on the merits because the court finds that the Maryvale placement was a FAPE. Accordingly, Plaintiffs' renewed motion for a preliminary injunction is DENIED.

## VI. Motion for Contempt

A brief time after seeking preliminary injunctive relief when the case was remanded, Plaintiffs also filed a motion for contempt and other relief, specifically seeking

the preparation of fair and valid report cards for Daniel, reimbursement for the expenses of funding Daniel's NJ LIFE

program, including overlap training hours and hours for missed therapy made up in subsequent weeks, the interest cost of the debt borne by the Wagners to fund Daniel's program, compensation for loss of income, compensation for the expense of relocating the children to obtain the free appropriate public education services mandated by this Court's orders, compensation for the anxiety, stress and other physical and emotional suffering caused by MCPS's violations, reasonable attorneys' fees and costs for this proceeding.

Wagner I, paper no. 85, at 41. Defendants oppose the contempt motion, arguing that the vacating of this court's prior orders justifies denial of the motion as a matter of law. Wagner I, paper no. 97, at 1. Secondarily, they argue that the declarations attached to Plaintiffs' motion ought not be considered unless discovery were conducted and an evidentiary hearing held.[7] *Id.* at 1–2.

### A. Standard for Contempt

 The purposes of civil contempt are to coerce obedience to a court order and to compensate a party for losses sustained as a result of the contumacy. *In re General Motors Corp.*, 61 F.3d 256, 258 (4th Cir.1995).

To establish civil contempt, a movant must show each of the following elements by clear and convincing evidence: (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) ... that the decree was in the movant's "favor"; (3) ... that the alleged contemnor by its conduct violated the

---

**7.** After having difficulty scheduling any sort of hearing, the court granted Defendants' motion to allow a deposition of Mrs. Wagner, and suggested that a telephone deposition might serve the needs of all parties. The court also stated that, unless the deposition occurred, the court would likely not consider the affidavits attached to the motion. According to the status letters later filed by counsel, no depositions were conducted.

terms of the decree, and had knowledge (at least constructive) of such violations; and (4) ... that [the] movant suffered harm as a result.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir.2000).

*JTH Tax, Inc. v. H & R Block Eastern Tax Services, Inc.*, 359 F.3d 699, 705 (4th Cir.2004). Willfulness is not an element of civil contempt. *In re General Motors*, 61 F.3d at 258.

■■■■■ If contempt is found, the remedy is within the trial court's broad discretion:

Remedies include ordering the contemnor to reimburse the complainant for losses sustained and for reasonable attorneys fees. *United States v. Trudell*, 563 F.2d 889, 891 (8th Cir.1977). However, the remedies and sanctions must be remedial and compensatory and, unlike criminal contempt, nonpunitive. [*United States v.*] *United Mine Workers* [*of America*], 330 U.S. [258] at 302–04, 67 S.Ct. 677, 91 L.Ed. 884 [ (1947)].

*Id.*, 61 F.3d at 259. Before awarding attorney's fees, however, a finding of "willful disobedience" may be required. *Omega World Travel, Inc. v. Omega Travel, Inc.*,

710 F.Supp. 169, 172–73 (E.D.Va.1989), *aff'd*, 905 F.2d 1530, 1990 WL 74305 (4th Cir.1990).[8]

### B. Analysis

■■■■■ Defendants correctly point out that the *Ashcraft* court itself held that an order does not qualify as "valid" if it has been reversed:

Since the mandatory procedures established by this court in *Knight* for sealing court documents were not followed by the district court before it issued its September 1997 sealing order, that order does not constitute a "valid decree," and therefore it cannot serve as a basis to sustain the court's civil contempt rulings. *See McLean v. Central States Pension Fund*, 762 F.2d 1204, 1210 (4th Cir.1985) ("reversal of the underlying order ordinarily invalidates any civil contempt sanctions predicated thereon") (citing *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1356 (5th Cir.1978) (citing cases)).

*Ashcraft*, 218 F.3d at 302 –303.[9] Plaintiffs did not even seek contempt relief until after the orders relied upon were vacated. The purpose of civil contempt is remedial, not punitive. If Plaintiffs were not enti-

---

**8.** In affirming, the Fourth Circuit wrote, in its unpublished decision:

The award or denial of attorneys' fees in civil contempt actions is within the discretion of the trial court, whose decision on such matters must be sustained on appeal absent an abuse of that discretion. *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 428, 43 S.Ct. 458, 466, 67 L.Ed. 719, 731 (1923); *Folk v. Wallace Business Forms, Inc.*, 394 F.2d 240, 243 (4th Cir. 1968). In exercising that discretion, a court may assess attorneys' fees as part of the fine to be levied on the contemnor for the "willful disobedience" of a court order. *Alyeska Pipeline Service. Co. v. Wilderness Society*, 421 U.S. 240, 258, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141, 154 (1975); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18

L.Ed.2d 475, 479 (1967). In *Wright v. Jackson*, 522 F.2d 955, 958 (4th Cir.1975), this court indicated that a contemnor's refusal to comply with a court order must rise to the level of obstinacy, obduracy or recalcitrance to satisfy the "willful disobedience" standard enunciated by the Supreme Court in *Alyeska* and *Fleischmann*.

*Omega World Travel, Inc. v. Omega Travel and Shipping Agencies, Inc.*, 905 F.2d 1530, 1990 WL 74305, at \*4 (4th Cir.1990).

**9.** The Fourth Circuit had earlier held: "Although a criminal contempt sanction stands even if the underlying order is reversed, reversal of the underlying order ordinarily invalidates any civil contempt sanctions predicated thereon. *See* [*Barton*], 569 F.2d [at] 1356 (citing cases)." *McLean*, 762 F.2d at 1210.

tled to the relief outlined in the orders this court entered, and the Fourth Circuit has so held, they cannot be entitled to remedial measures to force compliance or to compensate them for violations. Further, as this court declines to enter, *nunc pro tunc,* or otherwise, another injunction, there can be no finding of contempt.

## VII. Conclusion

For the foregoing reasons, summary judgment will be entered against Plaintiffs and in favor of Defendants on the administrative appeal, and Plaintiffs' motions for preliminary injunctive relief and for contempt will be DENIED. All prayers for relief in Plaintiffs' original complaint (Wagner I, paper no. 1) have been denied, superseded or are rendered moot by this decision. Defendants' third party complaint (Wagner I, paper no. 11) is also rendered moot by this decision, and it will be dismissed without prejudice. Both cases will be closed. A separate Order will follow.

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this 29th day of September, 2004, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion of Plaintiffs Daniel G. Wagner, Jr., Regina Wagner, and Daniel Wagner, Sr., for summary judgment (DKC 2003–0255, paper no. 20) BE, and the same hereby IS, DENIED;

2. The motion of Plaintiffs to re-enter the vacated preliminary injunction (DKC 2002–0763, paper no. 81) BE, and the same hereby IS, DENIED;

3. The motion of Plaintiffs for an order of contempt against Defendants (DKC 2002–0763, paper nos. 85 and 86) BE, and the same hereby IS, DENIED;

4. The Third Party Complaint against CSAAC (DKC 2002–0763, paper no. 11) BE, and the same hereby IS, DISMISSED WITHOUT PREJUDICE;

5. The motion of Defendants Board of Education of Montgomery County and Jerry D. Weast for summary judgment (DKC 2003–0255, paper no. 24) BE, and the same hereby IS, GRANTED;

6. Judgment BE, and the same hereby IS, ENTERED in favor of Defendants Board of Education of Montgomery County and Jerry D. Weast, and against Plaintiffs Daniel G. Wagner, Jr., Regina Wagner, and Daniel Wagner, Sr., on all claims in DKC 2003–0255; and

7. The Clerk will transmit copies of this Memorandum Opinion and this Order to counsel for the parties, and CLOSE these cases.